**DISNEY ENTERPRISES, INC. f/k/a The Walt Disney Company, Appellant,**

v.

**ESPRIT FINANCE, INC., Appellee.**

**No. 04–97–00879–CV.**

Court of Appeals of Texas,
San Antonio.

May 27, 1998.

Rehearing Overruled July 27, 1998.

Harriet E. Miers, Thomas A. Connop, Thomas F. Loose, Kirsten M. Castaneda, Locke Purnell Rain Harrell, P.C., Dallas, Arnulfo Gonzalez, Jr., Law Offices of Arnulfo Gonzalez, Laredo, for Appellant.

Ape C.M. Zaffirini, Zaffirini & Castillo, Laredo, for Appellee.

Before STONE and GREEN and · ANGELINI, JJ.

## OPINION

STONE, Justice.

This is an accelerated appeal from an interlocutory order denying Disney Enterprises, Inc.'s ("Disney") Rule 120a special appearance. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(7) (Vernon Supp.1998). Because we find that Disney is not amenable to suit in Texas, we reverse the trial court's order and order the cause dismissed for lack of personal jurisdiction.

### FACTUAL & PROCEDURAL BACKGROUND

On June 6, 1995, Esprit Finance, Inc. ("Esprit") filed suit in Texas against Disney Enterprises, Inc., and several other defendants [1] for fraud and negligent misrepresentation arising out of a failed business transaction.

In August 1993, Sergio Trevino Sada ("Trevino"), an agent of Esprit, was contacted in Mexico by Rene Mijares of Mussari S.A. de C.V. on behalf of Global Talent Group, Inc., a Florida corporation with its principal office in Oklahoma, about sponsoring and promoting the Disney Symphonic Fantasy Tour in Mexico. Trevino and Mijares traveled to Norman, Oklahoma and met with Global representatives Howard Pollack and Cesar Morales to discuss the business venture. Trevino claims that a contract was produced at this meeting, and that Pollack and Morales represented that they were negotiating on behalf of Disney. Trevino states that in the contract rider, Disney was defined as "The Walt Disney Company and its related and affiliated companies." Trevino was informed that the tour was scheduled to run from August 31, 1993 through September 18, 1993, at a cost of one million dollars. The total cost would be financed through advanced ticket sales, except that Esprit would need to contribute $250,000. Of this $250,000 contribution, $30,000 was needed up front to cover rehearsal expenses, and $220,000 was to be placed in an escrow account in Florida. Trevino was told the escrow account would remain untouched unless ticket sales failed to cover expenses. Trevino was also assured that the performers would be able to obtain the necessary visas.

On August 13, 1993, Trevino and Morales flew from Oklahoma to McAllen, Texas. From McAllen, the men drove to Mission, Texas to withdraw $30,000. Trevino states that in Texas Morales reiterated that Global represented Disney and the $30,000 was needed as a good faith gesture to lock in the contract. Based on these representations, Trevino gave Morales $30,000 in cash and had $220,000 wire transferred to a Florida bank account.

On August 24, 1993, Esprit was notified the tour performances in Mexico were canceled. Esprit contacted the Florida bank for the return of the escrow funds only to learn the account had been liquidated. Esprit's attorney, John Harmon, contacted Disney's general counsel office in California to inquire about the missing funds. Harmon states he spoke with Disney attorney Sandy Litvak who explained, "Global had negotiated with an agent of the Walt Disney Company for

---

1. Howard D. Pollack, Cesar Morales, Mussari S.A. de C.V. and Rene Mijares Reyes were also named defendants. All parties to the lawsuit, including Esprit, are nonresidents of Texas. Esprit is a British Virgin Islands corporation; Disney is a Delaware corporation; Global is a Florida corporation; and Mussari S.A. de C.V. is a Mexican corporation.

the performance of the Disney Symphonic Fantasy in Guadalajara and Monterrey, Mexico.... Global was to make payment of $400,000 by August 24, 1993.[T]hat payment was not made.... Disney had incurred $250,000 in expenses and demanded that amount.... Disney eventually received $220,000 for expenses from its agents that had negotiated with Global."

Esprit attributes the tour's cancellation to Disney's difficulties in obtaining visas for the performers. Evidence introduced by Disney offers a different explanation for the cancellation. BCLF, a Canadian corporation, schedules the world-wide promotions of the Disney Symphonic Fantasy Tour for Walt Disney Special Events Company, a subsidiary of Disney. Once a location is selected, BCLF arranges a promotion package for the show. It appears that Global and BCLF had entered into a deal for the promotions of the August–September 1993 Mexico tour. As part of the contract, Global was required to make a payment of $400,000 to BCLF by August 24, 1993. BCLF did not receive the money, and consequently the tour was canceled. The record indicates that John Meglen, BCLF's touring division director, informed Global on August 24, 1993 that the show was canceled due to Global's failure to remit the final deposit. Meglen also informed Global that due to its breach, it was retaining Global's "deposit."

Esprit filed suit in Webb County for fraud/negligent representation. Disney filed a special appearance pursuant to Rule 120a challenging personal jurisdiction. The trial court had two hearings on the matter. Following the first hearing, the trial court granted Disney's special appearance and dismissed Esprit's claims against Disney for lack of jurisdiction. Esprit filed a motion for reconsideration, and following a hearing on this motion, the trial court reversed itself. The trial court set aside and vacated its earlier order and findings of fact and conclusions of law and entered findings of fact and conclusions of law in support of its denial of Disney's special appearance.

## PERSONAL JURISDICTION OVER NONRESIDENT

■ A Texas court may exercise jurisdiction over a nonresident if: (1) the Texas long-arm statute authorizes the exercise of jurisdiction, and (2) the exercise of jurisdiction comports with state and federal constitutional guarantees of due process. *See Guardian Royal Exch. Assur., Ltd. v. English China*, 815 S.W.2d 223, 226 (Tex.1991). The Texas long-arm statute authorizes the exercise of jurisdiction over nonresident defendants "doing business" in Texas. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 17.042 (Vernon 1997). The statute expressly identifies several acts that constitute "doing business," and states that such list is not an exhaustive list. The "broad language" of the long-arm statute permits an expansive reach, limited only by federal constitutional requirements of due process. *Schlobohm v. Schapiro*, 784 S.W.2d 355, 357 (Tex.1990). Thus, we need only consider whether it is consistent with federal constitutional requirements of due process for Texas to assert personal jurisdiction over Disney.

■ Under the federal constitutional test of due process, a state may assert personal jurisdiction over a nonresident defendant if: (1) the defendant has purposely established minimum contacts with the forum state, and (2) the exercise of jurisdiction comports with fair play and substantial justice. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475–76, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

### 1. Minimum Contacts

■ Under the minimum contacts analysis, we focus on the defendant's intentional activities and expectations in deciding whether it is proper to call him before the forum state's courts. *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291–92, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). The minimum contacts requirement may be satisfied if either specific or general jurisdiction exists. Specific jurisdiction attaches if the cause of action arises out of or relates to the nonresident defendant's contact with the forum state. *Guardian Royal*, 815 S.W.2d at 227. The contact between the defendant and the forum state must have occurred as a result of the defendant's purposeful conduct. *Id.*

At second hearing and on appeal, Esprit approached this case as a specific jurisdiction case. Specifically, Esprit argued that the minimum contacts requirement was satisfied through the alleged tortious conduct of Disney's agents, Pollack and Morales. Esprit contends Pollack and Morales, acting as Disney's agents, defrauded Esprit in Texas. Esprit further asserts that Disney later ratified Global's conduct by retaining the fruit of the fraud, confirming that Global was acting as Disney's agent, and thereby subjecting Disney to jurisdiction in Texas. Esprit's contention that Disney is amenable to suit in Texas under an agency theory of vicarious liability does not find support in the record.

**▮** We begin with the general proposition that the law does not presume agency. *Buchoz v. Klein*, 143 Tex. 284, 184 S.W.2d 271, 271 (1944). The individual alleging agency has the burden to prove its existence. *Id.* Further, absent actual or apparent authority, an agent cannot bind a principal. *Currey v. Lone Star Steel Co.*, 676 S.W.2d 205, 209 (Tex.App.—Fort Worth 1984, no writ). Actual authority denotes that authority which the principal intentionally confers upon the agent, or intentionally allows the agent to believe he has, or by want of ordinary care allows the agent to believe himself to possess. *Spring Garden 79U, Inc. v. Stewart Title Co.*, 874 S.W.2d 945, 948 (Tex. App.—Houston [1st Dist.] 1994, no writ). Apparent agency exists where the principal's conduct would lead a reasonably prudent person to believe that the agent possessed the authority to act on behalf of the principal. *See Maccabees Mut. Life Ins. Co. v. McNiel*, 836 S.W.2d 229, 232–33 (Tex.App.—Dallas 1992, no writ). Apparent authority is determined by looking to the acts of the principal and ascertaining whether those acts would lead a reasonably prudent person using diligence and discretion to suppose the agent had the authority the agent purported to exercise. *NationsBank, N.A. v. Dilling*, 922 S.W.2d 950, 953 (Tex.1996). Only the acts of the principal may be considered; representations made by the purported agent of his authority have no effect. *Southwest Title Ins. Co. v. Northland Bldg. Corp.*, 552 S.W.2d 425, 428 (Tex.1977). Both actual and apparent authority are created through con-

duct of the principal communicated either to the agent (actual authority) or to a third party (apparent authority). *Currey*, 676 S.W.2d at 210 (citing *Product Promotions, Inc. v. Cousteau*, 495 F.2d 483 (5th Cir. 1974)). Finally, a party dealing with an agent must ascertain both the fact and the scope of the agent's authority, and if the party deals with the agent without having made such a determination, he does so at his own risk. *Elliot Valve Repair Co. v. B.J. Valve & Fitting Co.*, 675 S.W.2d 555, 561 (Tex.App.—Houston [1st Dist.]), *rev'd on other grounds*, 679 S.W.2d 1 (Tex.1984).

**▮** In the instant case, there is no evidence demonstrating that Disney, the purported principal, gave Global actual authority to act as its agent, or that Disney negligently allowed Global to believe it had been given actual authority to represent Disney. In fact, Disney introduced uncontradicted evidence to the contrary. Disney's evidence established that Global did not have actual authority to act as its agent. With respect to apparent authority, Esprit points only to the conduct of Pollack and Morales, which consists of presenting a contract containing a reference to Disney, and Pollack and Morales' oral assurances of their authority, as evidence that Global was authorized to act as Disney's agent. As noted, in order to charge the principal through apparent authority of his agent, the third party must establish conduct by the principal or written or spoken words by the principal that would lead a reasonably prudent person to believe the agent had the authority to act. *See NationsBank*, 922 S.W.2d at 953. Here, Global did allegedly present Esprit with a "package" and a contract rider that identified Disney, and Global repeatedly stated that it was authorized to negotiate for Disney. These representations were unilaterally orchestrated by Global. Without acts of the purported principal, acts of a purported agent which may mislead persons into false inferences of authority, however reasonable, will not serve as predicate for apparent authority. *Southwest Land Title Co. v. Gemini Financial Co.*, 752 S.W.2d 5, 7 (Tex.App.—Dallas 1988, no writ). Moreover, the fact that Global may have had a contract with one of *Disney's*

*agents* does not improve Esprit's position. That is, Global's contractual relationship with BCLF would not, by itself, empower Global to act as Disney's agent absent written or oral manifestations from Disney that it intended to have Global act on its behalf.

Esprit further asserts that an agency relationship between Global and Disney has been demonstrated because Disney ratified Global's alleged tortious conduct by retaining the fruit of the fraud, thereby confirming that Global was acting as Disney's agent. Disney counters that because ratification is a doctrine of agency, it is inapplicable when no underlying agency is proved. *See Southwestern Inv. Co. v. Neeley,* 412 S.W.2d 925, 932 (Tex.Civ.App.—Fort Worth 1967), *modified on other grounds,* 430 S.W.2d 465 (Tex.1968); *see also Lynn v. United Technologies Corp., Inc.,* 916 F.Supp. 1217, 1220 (M.D.La.1996); *Shapiro v. American Home Assur. Co.,* 584 F.Supp. 1245, 1251 (D.Mass.1984); *E.P. Dobson, Inc. v. Richard,* 17 Ark.App. 155, 705 S.W.2d 893, 894 (1986). Disney further argues that without evidence of a pre-existing agency relationship, the doctrine of ratification cannot create one. *See Neeley,* 412 S.W.2d at 932.

■ Ratification is the affirmance by a person of a prior act which when performed did not bind him, but which was professedly done on his account, whereby the act is given effect as if originally authorized by him. RESTATEMENT (SECOND) OF AGENCY § 82 (1958). Ratification, in this context, is not a form of authorization, but a legal concept in agency law describing the relations between parties after affirmance by a person of a transaction done or purported to be done for him. RESTATEMENT (SECOND) OF AGENCY § 82 cmt. a, b (1958). A ratification will lie when the individual for whom an act was done retains the benefits of the transaction after acquiring full knowledge of the transaction. *See Land Title Co. of Dallas v. F.M. Stigler, Inc.,* 609 S.W.2d 754, 756 (Tex.1980). Most caselaw interpreting the doctrine of ratification couches its discussion in the context of an existing agency relationship where the agent exceeds the scope of her authority and the principal later accepts the benefits of such act after acquiring full knowledge. *See*

*e.g., id.; Humble Nat'l Bank v. DCV, Inc.,* 933 S.W.2d 224, 237 (Tex.App.—Houston [14th Dist.] 1996, writ denied); *Old Republic Ins. Co., Inc. v. Fuller,* 919 S.W.2d 726, 728 (Tex.App.—Texarkana 1996, writ denied). Ratification, however, can occur outside this general paradigm. *See* RESTATEMENT (SECOND) OF AGENCY § 85 cmt d of (1) (1958). While most cases will fall within the context of an agency relationship, such a relation is not necessary to cause the ratification to be effective. *See id.* It is true, however, that because ratification is not a form of authorization, the ratification of an act of a stranger will not create an agency relationship, it will only bind the ratifier to the specific transaction that is ratified. *See* RESTATEMENT (SECOND) OF AGENCY § 82 cmt d, § 85 cmt d of (1) (1958).

■ As applied to the instant case, however, the doctrine of ratification does not aid Esprit's position. Esprit relies upon Harmon and Litvak's conversation as evidence that Disney knowingly retained the benefits of a fraud after acquiring full knowledge of the fraudulent transaction. We disagree. First, the record does not contain documentation regarding the whereabouts of Esprit's money. In fact, there is no documentation regarding either the initial deposit of money into the escrow account, or the liquidation of the account. Moreover, the Harmon/Litvak conversation merely confirms that Disney is in possession of Global's money, which may or may not in actuality be Esprit's money. Second, the evidence suggests that any money acquired by Disney or the Disney Special Events Company was acquired lawfully through a contract between Global and BCLF. The record indicates that Global had a contract with BCLF in which Global was required to pay BCLF a final down payment on August 24, 1993 for the tour. Global allegedly failed to pay, thereby breaching its contract. In response to the breach, BCLF retained Global's "deposit." Thus, because there is no evidence that Disney retained Esprit's money after acquiring full knowledge of an alleged fraudulent transaction, the doctrine of ratification is inapplicable to the instant case. Because the record does not affirmatively establish that

Global had actual or apparent authority to bind Disney, it was error for the trial court to conclude that the minimum contacts requirement had been met. *See Koch Graphics, Inc. v. Avantech, Inc.,* 803 S.W.2d 432, 434–35 (Tex.App.—Dallas 1991, no writ).

### 2. Fair Play and Substantial Justice

■ Even if there was some evidence upon which to conclude that Disney had established minimum contacts with Texas, the assertion of jurisdiction is proper only if such exercise of jurisdiction comports with fair play and substantial justice. *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). In determining this second prong, courts consider: (1) the burden on the defendant, (2) the interest of the forum state in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental substantive social policies. *Burger King,* 471 U.S. at 476–77, 105 S.Ct. 2174. We find that there is no evidence to support the trial court's conclusion that the exercise of jurisdiction in the instant case comports with fair play and substantial justice. First, Disney will probably incur substantial travel and litigation costs defending the case in South Texas. Second, Texas has no recognizable interest in the suit. No Texas residents are directly or indirectly involved in the suit; no Texas residents have been harmed by the alleged transactions; there are no witnesses residing in Texas; and there is no evidence to be gathered in Texas. Third, Esprit's interest in obtaining relief would not be impaired if it had to litigate the case in Oklahoma or California. Fourth, Oklahoma seemingly has an interest in litigating the case because Global is operating out of Oklahoma, Global brought Esprit to Oklahoma, and the alleged fraudulent negotiations began in Oklahoma.

### CONCLUSION

Esprit, the apparent victim of a business scam, is a sympathetic plaintiff attempting to recover a substantial sum of money it gave to a company in good faith during a business transaction. It is well settled, however, that a nonresident defendant will not be made to answer to a suit in a jurisdiction based upon the unilateral activity of third party. *See Guardian Royal,* 815 S.W.2d at 227. The record demonstrates that Global was not authorized either by actual or apparent authority to act on Disney's behalf. The record further demonstrates that Disney did not ratify Global's alleged fraudulent activity, but rather that Disney lawfully obtained money from Global through a contract between Global and one of Disney's agents. Because the record establishes that Disney has no contacts with Texas, the trial court erred in denying Disney's special appearance. Point of error number one is sustained.

Accordingly, the judgment of the trial court is reversed and the cause is dismissed for lack of personal jurisdiction over Disney. *See* TEX.R.APP. P. 43.2(c).