In re Robert G. QUINLIVAN and Kimberly A. Quinlivan, Debtors.

Tummel & Carroll, Plaintiffs,

v.

Robert G. Quinlivan and Kimberly A. Quinlivan, Defendants.

Bankruptcy No. 96–14923.
Adversary No. 02–1249.

United States Bankruptcy Court, E.D. Louisiana.

Aug. 9, 2006.

Brad P. Scott, Houma, LA, Harold K. Tummel, Tummel & Casso, McAllen, TX, Thomas J. Lutkewitte, New Orleans, LA, for plaintiffs.

Elizabeth J. Futrell, New Orleans, LA, Joshua J. Lewis, Tara G. Richard, Jones, Walker, New Orleans, LA, for defendants.

## MEMORANDUM OPINION

JERRY A. BROWN, Bankruptcy Judge.

This matter came before the court on May 24, 2004 on the trial of the Complaint

to Determine Dischargeability of Debt pursuant to 11 U.S.C. § 523 filed by Tummel & Carroll. The complaint was dismissed and an appeal was taken. The matter was remanded to this court by order of the United States Fifth Circuit Court of Appeals for further findings consistent with the Fifth Circuit's opinion in *Tummel & Carroll v. Quinlivan (In re Quinlivan)*, 434 F.3d 314 (5th Cir.2005).

The court finds that Texas state agency law should apply to this case, that Donald Totten did act as Robert Quinlivan's agent in securing the contract with Tummel & Carroll, and that Totten's actions in negotiating that contract amounted to conduct that makes Quinlivan's debt to Tummel & Carrol, as set forth in the judgment rendered by the Texas state court and recognized by the Civil District Court for the Parish of Orleans in Case No. 94–3215, nondischargeable under 11 U.S.C. § 523(a)(2)(A).

## I. Background Facts

Donald Totten, a California resident, contacted the law firm of Tummel & Carroll ("T & C"), a general partnership law firm in Dallas, Texas, seeking legal services for Worldwide Floral, Inc., ("WFI") and Worldwide Floral Exchange ("WFE"), both Louisiana corporations. At the time, Totten was the president of WFI, and Robert Quinlivan, the defendant in this proceeding, was the vice-president of WFE.

In order to secure T & C's legal services on a contingent-fee basis, Totten represented to Kenneth Tummel of T & C that he was a wealthy investor who was familiar with the expenses associated with commercial litigation. Totten requested legal services in connection with a dispute between WFI, WFE, and Benchmark Bank

(the "bank"), a Texas corporation. Totten informed T & C that the bank had wrongfully terminated a VISA/MasterCard merchant account that had been established for WFI and WFE, that the bank had wrongfully placed WFI and WFE on a list of "terminated" merchants, and that WFI and WFE were suffering financial losses as a result of the bank's conduct. Totten wanted T & C to file and prosecute a suit against the bank seeking both injunctive relief and damages. Totten failed to disclose that false or misleading information was used to obtain the merchant account.

Totten reached an agreement with T & C whereby T & C agreed to represent WFI and WFE in a suit against the bank. Totten requested that Tummel send copies of the contract engaging T & C to Totten in California and Quinlivan in Louisiana, which Tummel did.[1] On February 18, 1993, Totten and Quinlivan signed a retainer agreement with T & C for legal representation on a contingent-fee basis.[2] The contract was signed by Quinlivan in his individual capacity, by Quinlivan as vice-president of WFE, and by Totten as president of WFI. The contract contained a provision that if Totten and Quinlivan decided to withdraw their claims against the bank, they owed T & C for legal services rendered on an hourly basis in lieu of the contingency fee. After the Texas court denied a request for a temporary injunction that would have required the bank to remove WFI and WFE from its terminated merchant list, Totten and Quinlivan informed T & C that they no longer wished to pursue their claims against the bank. After Totten and Quinlivan failed to pay the invoice sent by T & C for its hourly charges, T & C sued Totten, Quinlivan, WFE, and WFI in Texas state court for

---

1. Trial Transcript p. 18.

2. Exhibit 1, Agreement to Employ Counsel.

breach of contract; T & C also sued Totten for fraud. The claim against Quinlivan was resolved on summary judgment, by which T & C was awarded $45,222.20 plus six percent pre-judgment interest and reasonable attorney's fees. The fraud claim against Totten was settled.[3]

On October 11, 1996, Quinlivan and his wife filed for Chapter 7 bankruptcy. Quinlivan did not list T & C's judgment as a liability; however, in 2002, the Quinlivans sought to reopen the 1996 bankruptcy case in order to discharge their debt to T & C. T & C filed a complaint to except the discharge of the debt pursuant to 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(3).[4] This court held that Quinlivan made no fraudulent representation to T & C; therefore, the debt was not excepted from discharge under section 523(a)(2)(A).[5] T & C appealed that decision to the district court, which affirmed the decision.

On further appeal to the United States Fifth Circuit Court of Appeals, T & C argued that Quinlivan was responsible for Totten's allegedly fraudulent representations under the relevant agency and partnership law. The Fifth Circuit then remanded the case to the bankruptcy court for a determination of: 1) which state's agency law applies in determining whether an agency relationship existed between Donald Totten and Robert Quinlivan; and 2) whether Totten acted as Quinlivan's agent in negotiating the contract with T & C; furthermore, if Totten was acting as Quinlivan's agent, the court must determine whether Totten indeed committed fraud in connection with the T & C contract for legal representation.[6]

## II. Legal Analysis

### A. State Agency Law

Agency issues are matters of state law, not federal law.[7] The Fifth Circuit has stated that, in resolving issues of state law arising in the context of a bankruptcy proceeding, a threshold question is whether "a federal court must apply the choice of law rules of the forum state in which it sits, ... or may exercise its independent judgment and choose whatever state's substantive law it deems appropriate in the context of the case before it."[8] Where the transaction has multistate contacts, "the determination of which particular state's law should apply requires the exercise of an informed judgment in the balancing of all the interests of the states with the most significant contacts in order to best accommodate the equities among the parties to the policies of those states."[9] Upon remand, this court asked the parties to brief their arguments as to

---

3. *Tummel & Carroll v. Quinlivan* (*In re Quinlivan*), No. 04–2055, slip op. at 2–3 (E.D.La. Dec. 24, 2004).

4. Section 523(a)(2)(A) excepts from discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud." Section 523(a)(3) excepts from discharge any debt "neither listed nor scheduled under section 521(1) of this title, with the name, if known to the debtor, of the creditor to whom such debt is owed."

5. *Tummel & Carroll v. Quinlivan* (*In re Quinlivan*), Ch. 7 Case No. 96–14923, Adv. No. 02–

01249, slip op. at 155 (Bankr.E.D.La. July 21, 2004).

6. *Tummel & Carroll v. Quinlivan* (*In re Quinlivan*), 434 F.3d 314 (5th Cir.2005).

7. *Easter Seal Soc'y For Crippled Children & Adults of La., Inc. v. Playboy Enter.*, 815 F.2d 323, 335 (5th Cir.1987).

8. *Woods–Tucker Leasing Corp. of Ga. v. Hutcheson–Ingram Dev. Co.*, 642 F.2d 744, 748 (5th Cir.1981) (citations omitted).

9. *Id.*

which state's agency laws should apply to this dispute. T & C argues that the agency laws of Texas should apply. Quinlivan argues that it does not matter whether Louisiana or Texas agency law applies because the laws are so similar that the same result is reached in either event. Because the order remanding the case specifically directed the court to make a determination as to which law applies, the court examines both Louisiana and Texas agency laws.

### a. Texas State Law

■ Under Texas state law an agent is defined as "one who is authorized by another to transact business or manage some affair for him."[10] Under Texas law, "a principal is liable for the acts of its agent when the agent has actual or apparent authority to do these acts."[11]

■ An agent has actual authority when the principal intentionally confers such authority upon the agent, intentionally allows the agent to believe that he possesses such authority, or allows the agent to believe that he possesses this authority by want of due care.[12] Actual authority encompasses both express and implied authority.[13] There is express authority where "the principal has made it clear to the agent that the principal wants the act under scrutiny to be done."[14] Implied authority exists when "there is no proof of express authority, but appearances justify a finding that, in some manner, the agent was authorized to do what he did; in other words, there is circumstantial proof of actual authority."[15]

■ Apparent authority is created when "the principal's conduct would cause a reasonable person to believe the agent has the authority he is purporting to exercise."[16] This is generally used when the principal is attempting to deny agency.[17] A court may consider only the conduct of the principal in determining the existence of apparent authority.[18]

### b. Louisiana State Law

Louisiana has its own terminology and uses the word "mandate" and its related terms to refer to the issues at hand.[19] The Louisiana Civil Code states: "The authority of the representative may be conferred by law, by contract, such as mandate or partnership, or by the unilateral juridical

---

10. *Welch v. Coca–Cola Enter., Inc.,* 36 S.W.3d 532, 539 (Tex.App.2000).

11. *Cadle Co. v. Morgan,* 2005 WL 856901 at *2 (Tex.App. Apr.14, 2005) (*citing Spring Garden 79U, Inc. v. Stewart Title Co.,* 874 S.W.2d 945, 948 (Tex.App.1994)).

12. *Cadle Co.,* 2005 WL 856901 at *2 (*citing Spring Garden,* 874 S.W.2d at 948; *Currey v. Lone Star Steel Co.,* 676 S.W.2d 205, 209–10 (Tex.App.1984); *Behring Int'l, Inc. v. Greater Houston Bank,* 662 S.W.2d 642, 649 (Tex.App. 1983)); *see also Welch v. Coca–Cola Enter., Inc.,* 36 S.W.3d 532, 539 (Tex.App.2000).

13. *Cadle Co.,* 2005 WL 856901 at *2.

14. *Id.* (*citing City of San Antonio v. Aguilar,* 670 S.W.2d 681 (Tex.App.1984)).

15. *Cadle Co.,* 2005 WL 856901 at *2.

16. *Bailey v. Paseo Del Rio Ass'n,* 2005 WL 2989312 at *1 (*citing Rourke v. Garza,* 530 S.W.2d 794, 802 (Tex.1975)).

17. *Bailey,* 2005 WL 2989312 at *1 (*citing Baptist Mem'l Hosp. Sys. v. Sampson,* 969 S.W.2d 945, 947 (Tex.1998)).

18. *NationsBank, N.A. v. Dilling,* 922 S.W.2d 950, 953 (Tex.1996).

19. Although the Louisiana Civil Code does not use the language "agency" and its related terms, many courts in Louisiana do use such language. *See, e.g., Houston Exploration Co. v. Halliburton Energy Services, Inc.,* 359 F.3d 777 (5th Cir.2004); *Tedesco v. Gentry Dev., Inc.,* 540 So.2d 960 (La.1989).

act of procuration."[20] A mandate is defined as "a contract by which a person, the principal, confers authority on another person, the mandatary, to transact one or more affairs for the principal."[21]

Under Louisiana law, like Texas, "an agent's authority is composed of his actual authority, express or implied, together with the apparent authority which the principal has vested in him by his conduct."[22] Express authority is created "by the oral or written agreement between the principal and the agent."[23] Implied authority is established, "by the words and conduct of the parties and the circumstances of the case[,] . . . and may be created even though there is no intention to do so."[24] It is created when, "from the nature of the principal's business and the position of the agent within that business, the agent is deemed to have permission from the principal to undertake certain acts which are reasonably related to the agent's position and which are reasonable and necessary concomitants of the agent's

express authorization."[25] Implied authority essentially exists when the principal has the right to control the agent's conduct and the agent has the right and authority to represent or bind the principal.[26]

Apparent authority exists when "the principal has acted in such a manner so as to give an innocent third party the reasonable belief that the agent has the authority to act for the principal."[27] The term implied authority is seemingly used in Louisiana with respect to apparent authority as well as actual authority.[28] Actual authority is "implied," even if unintended, when the agent is deemed to have authority to perform certain acts on the principal's behalf because of the agent's position within the principal's business.[29] Apparent authority is "implied" from the principal's conduct that reasonably indicates to a third party that the agent has authority to act on the principal's behalf.[30]

**20.** LA. CIV CODE art. 2986 (West 2005).

**21.** LA. CIV. CODE art. 2989 (West 2005); *see generally Holloway v. Shelter Mutual Ins. Co.*, 861 So.2d 763, 770 (La.App. 3 Cir. 12/10/03).

**22.** *Cartinez v. Reliable Amusement Co., Inc.*, 746 So.2d 246, 250 (La.App. 3 Cir. 11/3/99) (*citing Boulos v. Morrison*, 503 So.2d 1, 3 (La.1987); *Duplessis Cadillac, Inc. v. Creative Services, Inc.*, 564 So.2d 336, 339 (La.App. 1st Cir.1990)); *see Houston Exploration Co. v. Halliburton Energy Services, Inc.*, 359 F.3d 777, 780 (5th Cir.2004).

**23.** *Houston Exploration Co.*, 359 F.3d at 780 (*citing AAA Tire & Exp., Inc. v. Big Chief Truck Lines, Inc.*, 385 So.2d 426, 429 (La.App. 1st Cir.1980)).

**24.** *Anderson Window & Patio Co., Inc. v. Dumas*, 560 So.2d 971, 975 (La.App. 4th Cir. 1990) (*citing Sales Purchase Corp. v. Puckett*, 417 So.2d 137 (La.App. 2nd Cir.1982)), *writ denied*, 421 So.2d 250 (La.1982).

**25.** *Mitchell Eng'g Co. v. Ronald A. Goux, Inc.*, 413 So.2d 942, 945 (La.App. 1st Cir.1982).

**26.** *Dumas*, 560 So.2d at 975 (*citing Craft v. Trahan*, 351 So.2d 277 (La.App. 4th Cir. 1977), *writ refused*, 353 So.2d 1336 (La. 1978)).

**27.** *Dumas*, 560 So.2d at 975 (*citing Davidson v. Board of Trustees, State Employees Group Benefits Program*, 481 So.2d 708 (La.App. 1st Cir.1985); *Jackson v. Wal Mart Properties, Inc.*, 452 So.2d 409 (La.App. 3d Cir.1984)).

**28.** *See Mitchell Eng'g Co.*, 413 So.2d at 945; *see also Bamburg Steel Buildings, Inc. v. Lawrence Gen. Corp.*, 817 So.2d 427, 432 (La.App. 2 Cir. 05/08/02) ("An agency relationship may be created by an express appointment of a mandatary . . . or by implied appointment arising from apparent authority in order to protect third parties").

**29.** *Mitchell Eng'g Co.*, 413 So.2d at 945.

**30.** *Dumas*, 560 So.2d at 975.

### c. Texas agency law applies in this case

The court finds that although the signature page of the contract for legal services was transmitted to Louisiana for execution by the defendant, and the defendant was living in Louisiana at the time the contract was executed, the defendant nonetheless subjected himself to the laws of Texas with respect to the contract. Quinlivan engaged a Texas attorney to file suit on his behalf in a Texas state court against a Texas bank. Further, the contract between the parties contains a choice of law provision specifying Texas law shall apply to the contract. The judgment against Quinlivan for the failure to pay the attorney's fees owed under the contract was rendered in a Texas state court where Quinlivan apparently did not contest the court's jurisdiction over him. It appears that Texas would have a far greater interest than Louisiana in seeing that Texas lawyers be paid for legal services rendered in Texas, specifically a suit in a Texas court on a cause of action arising in Texas. Further, T & C argues for the application of Texas law, and Quinlivan does not argue otherwise. Thus, the court finds that the contract language and the strong interests of Texas in having its law applied in this situation warrant the application of Texas law by this court.

### B. Existence of an Agency Relationship between Quinlivan and Totten

The court finds that Totten had actual authority to negotiate the contract on behalf of Quinlivan. There does not appear to be express authority given the lack of evidence of either a written or verbal agreement directly granting Totten any authority. Nevertheless, Totten had implied authority to negotiate with T & C. It is undisputed that Totten contacted T & C for the purpose of securing legal representation not only for Totten, but also for Quinlivan and their respective companies, WFI and WFE.[31] In fact, Quinlivan acknowledges that, at the time, he was aware that Totten was discussing the legal representation of WFE, Quinlivan's company, with Tummel.[32] Given Quinlivan's knowledge, Totten had the implied authority to negotiate on Quinlivan's behalf. Additionally, no subsequent negotiations took place between Quinlivan and T & C; Quinlivan merely signed the agreement, ratifying all the terms Totten had negotiated for him. Under Texas law, that is sufficient for the existence of implied authority.[33]

There is also evidence of apparent authority in this case. Quinlivan had no contact with T & C until the negotiations for legal representation were complete. Tummel stated that his understanding that he was representing Quinlivan arose only from representations made by Totten,[34] but Quinlivan's actions in relying completely on Totten to negotiate for him and then signing the contract as presented without comment is good evidence of apparent authority. The court finds that it was entirely reasonable for T & C to believe that Totten had authority to negotiate on Quinlivan's behalf given Quinlivan's lack of involvement in the negotiating process, and his subsequent signing of the contract for legal services.

---

31. Def. Br. on Issues of Agency Law at 2–3.

32. Trial transcript at 81.

33. *See Welch v. Coca–Cola Enterprises, Inc.,* 36 S.W.3d 532, 540 (Tex.App.2000) ("An agency may be implied from acquiescence ... [which] exists when there is conduct from which assent may be reasonably inferred") (citations omitted).

34. Trial transcript at 16.

■ Further, even if Totten did not have implied authority, Quinlivan ratified Totten's negotiations by signing the agreement with T & C for legal representation. Under Texas law, ratification is the "affirmance by a person of a prior act which when performed did not bind him, but which was professedly done on his account, whereby the act is given effect as if originally authorized by him."[35] Thus, this court concludes that Totten did act as Quinlivan's agent in negotiating the contract for legal services with T & C under Texas state agency laws.

## C. Totten Committed Fraud

■ Because Totten is considered Quinlivan's agent, the remaining question is whether Totten's actions were such that the debt to T & C is nondischargeable under 11 U.S.C. § 523(a)(2)(A). If so, then as Quinlivan's agent, Totten's actions would be imputed to Quinlivan, and the debt in question would be nondischargeable. Section 523(a)(2)(A) of the Bankruptcy Code reads:

A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

The creditor must prove by a preponderance of the evidence that the debt is nondischargeable.[36] In general, § 523(a)(2)(A) "contemplates frauds involving moral turpitude or intentional wrong; fraud implied in law which may exist without imputation of bad faith or immorality is insufficient."[37] When defining the elements of nondischargeability, the Fifth Circuit has distinguished between actual fraud on one hand and false pretenses and false representations on the other.[38] For a debtor's representation to be a false pretense or representation under the terms of § 523(a)(2)(A), the Fifth Circuit holds it must have been, "1) a knowing and fraudulent falsehood, 2) describing past or current facts, 3) that was relied upon by the other party."[39] To determine the nondischargeability of a debt under the actual fraud theory, the Fifth Circuit uses the five factor test set forth in *RecoverEdge v. Pentecost*.[40] The objecting creditor must prove:

(1) the debtor made representations; (2) at the time they were made the debtor knew that they were false; (3) the debtor made the representations with the intention and purpose to deceive the creditor; (4) that the creditor relied on such representations; and (5) that the creditor sustained losses as a proximate result of the representations.[41]

Some courts require the creditor to have reasonably relied on the representation, but the Fifth Circuit does not.[42]

**35.** *Disney Enterprises, Inc. v. Esprit Finance, Inc.*, 981 S.W.2d 25, 31 (Tex.App.1998), *cited in Walker Ins. Services v. Bottle Rock Power Corp.*, 108 S.W.3d 538, 552 (Tex.App.2003).

**36.** *Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991).

**37.** *RecoverEdge v. Pentecost*, 44 F.3d 1284, 1292 (5th Cir.1995).

**38.** *Id. See also In re Allison*, 960 F.2d 481, 484–85 (5th Cir.1992); *In re Bercier*, 934 F.2d 689, 692 (5th Cir.1991).

**39.** *RecoverEdge v. Pentecost*, 44 F.3d 1284, 1293 (5th Cir.1995).

**40.** *Id.*

**41.** *Id.*

**42.** *In re Allison*, 960 F.2d 481, 484–85 (5th Cir.1992).

The court finds that Totten made false representations to T & C, or induced T & C to undertake representation of Totten, Quinlivan, WFI and WFE under false pretenses. First, in his attempt to acquire T & C's legal services, Totten knowingly made representations as to the merits of the claims against the bank, namely that the bank had wrongfully terminated a VISA/MasterCard merchant account that had been established for WFI and WFE, and that the bank had wrongfully placed WFI and WFE on a list of "terminated" merchants.[43] These representations were false because at the hearing for injunctive relief in the Texas state court, the evidence produced showed that the application for the merchant account contained false information, and thus, the account was not wrongfully terminated.[44] Second, the misrepresentations were of past or current acts because the events leading up to the dispute with the bank, including the submission of the application containing the false information, had all occurred before Totten contacted T & C. Finally, Tummel showed that he ultimately relied on these representations in agreeing to represent Totten, Quinlivan, and their respective companies on a contingent fee basis; had he known otherwise, Tummel would have required an hourly fee arrangement with a retainer deposit.[45]

T & C has also proved the elements of the five factor test for the actual fraud theory. Again, Totten made representations to T & C that the bank had wrongfully terminated a VISA/MasterCard merchant account that had been established for WFI and WFE, and that the bank had wrongfully placed WFI and WFE on a list of "terminated" merchants.[46] At the time the representations were made, Totten knew they were false because the application for the merchant account contained false information. The third element concerns the intent with which the representations were made. Because "intent to deceive may be inferred from reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation," [47] the court finds that Totten made the misrepresentations to T & C with the requisite intent to deceive required for a finding of actual fraud. It is clear that T & C relied on the representations of Totten; Tummel testified that he relied on these representations in agreeing to represent Totten, Quinlivan, and their respective companies on a contingent fee basis. Had he known otherwise, Tummel stated that he would have required an hourly fee arrangement with a retainer deposit.[48] Finally, T & C has suffered damages as a result of the misrepresentations in that it has yet to be paid for its services rendered.[49]

### III. *Conclusion*

For the foregoing reasons, the court holds that Totten was Quinlivan's agent for the purposes of negotiating the terms of T & C's legal representation of Totten, Quinlivan, and their respective companies, WFI and WFE. Additionally, the court holds that Totten obtained the services of T & C through false pretenses, false representations or actual fraud within the meaning of

43. Trial transcript at 19.

44. *Id* at 44.

45. *Id.*

46. Trial transcript at 19.

47. *In re Acosta,* 406 F.3d 367, 372 (5th Cir. 2005).

48. *Id.*

49. *Id.* at 41.

11 U.S.C. § 523(a)(2)(A) such that Quinlivan's debt to T & C, as set forth in the judgment rendered by the Texas state court and recognized by the Civil District Court for the Parish of Orleans in Case No. 94–3215, is nondischargeable under 11 U.S.C. § 523(a)(2)(A).