MEMORANDUM OPINION

No. 04-05-00727-CV


CROSS CREEK HOMES, INC.,

Appellant

v.

FIRST CONTINENTAL MORTGAGE COMPANY 

a/k/a First Continental Mortgage Company of Houston ,

Appellee

From the 216th Judicial District Court, Bandera County, Texas

Trial Court No. 9022-04

Honorable Stephen B. Ables , Judge Presiding




Opinion by: Phylis J. Speedlin , Justice



Sitting: Sandee Bryan Marion , Justice

 Phylis J. Speedlin , Justice

 Rebecca Simmons , Justice



Delivered and Filed: October 18, 2006



AFFIRMED

 Cross Creek Homes, Inc. appeals a summary judgment rendered in favor of First Continental Mortgage Company a/k/a
First Continental Mortgage Company of Houston (FCM). The basis of the various claims asserted by Cross Creek against
FCM are statements, representations or agreements made by David North, a senior loan officer for FCM, to provide staged
funding (1) to Cross Creek customers on land home purchases at a low interest rate. Because North did not have actual or
apparent authority to make such statements, representations or agreements or to otherwise approve loans for FCM, we
affirm the trial court's judgment.

Background


 Cross Creek was formed in February of 2000 to sell manufactured homes. In April of 2000, North approached Cross Creek
with a plan to provide financing for Cross Creek customers. Prior to this, Cross Creek had attempted to locate financing
with various lenders. By September of 2000, Cross Creek recognized that the financing they believed North had promised
would not be approved. Cross Creek defaulted on its floor plan financing in September of 2002 and ceased operations in
2003.

 In January of 2005, Cross Creek sued FCM alleging breach of contract, promissory estoppel, and fraud. In April of 2005,
Cross Creek filed a supplemental petition alleging fraudulent transfer and conspiracy. The trial court subsequently granted
FCM's traditional and no evidence motion for summary judgment.

Standard of Review


 We apply a de novo standard of review to summary judgments. Provident Life & Acc. Ins. Co. v. Knott, 128 S.W.3d 211,
215 (Tex. 2003). A traditional motion for summary judgment is properly granted only when the movant establishes that
there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. Nixon v. Mr.
Prop. Mgmt. Co., 690 S.W.2d 546, 548 (Tex. 1985). In reviewing the grant of a summary judgment, we indulge every
reasonable inference and resolve any doubts in favor of the non-movant. Id. at 549. Additionally, we assume all evidence
favorable to the non-movant as true. Id. at 548-49.

 A no-evidence summary judgment is improper if the non-movant presents more than a scintilla of probative evidence to
raise a genuine issue of material fact. Moore v. K Mart Corp., 981 S.W.2d 266, 269 (Tex. App.--San Antonio 1998, pet.
denied). More than a scintilla of evidence exists if it would allow reasonable and fair-minded individuals to differ in their
conclusions. Forbes,Inc. v. Granada Biosciences, Inc., 124 S.W.3d 167, 172 (Tex. 2003). Less than a scintilla of evidence
exists when the evidence is so weak as to do no more than create a mere surmise or suspicion of a fact. Id.

Discussion


 The law does not presume agency. Suarez v. Jordan, 35 S.W.3d 268, 272 (Tex. App.--Houston [14th Dist.] 2000, no pet.);
Disney Enterprises, Inc. v. Esprit Fin., Inc., 981 S.W.2d 25, 30 (Tex. App.--San Antonio 1998, pet. dism'd w.o.j.). The
individual alleging agency has the burden to prove its existence. Disney Enterprises, Inc., 981 S.W.2d at 30. Absent actual
or apparent authority, an agent cannot bind a principal. Id.

 Both actual and apparent authority are created through conduct of the principal communicated either to the agent (actual
authority) or to a third party (apparent authority). Suarez, 35 S.W.3d at 273; Disney Enterprises, Inc., 981 S.W.2d at 30. 
Actual authority denotes that authority which the principal intentionally confers upon the agent, or intentionally allows the
agent to believe he has, or by want of ordinary care allows the agent to believe himself to possess. Suarez, 35 S.W.3d at
273; Disney Enterprises, Inc., 981 S.W.2d at 30. Apparent authority arises through acts of participation, knowledge, or
acquiescence by the principal that clothe the agent with the indicia of apparent authority. Insurance Co. of North Am. v.
Morris, 981 S.W.2d 667, 672 (Tex. 1998). 

 Certain limitations apply in determining whether apparent authority exists. Suarez, 35 S.W.3d at 273. First, apparent
authority is determined by looking to the acts of the principal and ascertaining whether those acts would lead a reasonably
prudent person using diligence and discretion to suppose the agent had the authority to act on behalf of the principal. 
Suarez, 35 S.W.3d at 273; Disney Enterprises, Inc., 981 S.W.2d at 30. Only the conduct of the principal may be
considered; representations made by the agent of his authority have no effect. Suarez, 35 S.W.3d at 273; Disney
Enterprises, Inc., 981 S.W.2d at 30. Second, the principal must either have affirmatively held the agent out as possessing
the authority or the principal must have knowingly and voluntarily permitted the agent to act in an unauthorized manner. 
Suarez, 35 S.W.3d at 273. Finally, a party dealing with an agent must ascertain both the fact and the scope of the agent's
authority, and if the party deals with the agent without having made such a determination, the party does so at its own risk.
Suarez, 35 S.W.3d at 273; Disney Enterprises, Inc., 981 S.W.2d at 30.

 The evidence is uncontroverted that North did not have actual authority to approve loans; accordingly, North did not have
actual authority to make any statement, representation, or agreement relating to the approval of a loan. The affidavit of
Steve Brown, who was the branch manager of FCM's Universal City office and North's supervisor, states that North did not
have the company's authority to enter into any agreement or contract on behalf of FCM, did not have the authority to
approve a loan, and did not have authority to communicate any final approval for a loan. North also testified that he did not
have such authority.

 With regard to North's apparent authority, Cross Creek relies on the testimony of Sherry Burger, Ford Michael Meyers, and
Douglas T. Goode, who were the three representatives of Cross Creek. (2) Apart from representations made by North, which
have no effect in determining whether apparent authority exists, see Disney Enterprises, Inc., 981 S.W.2d at 30, the only
other evidence relied upon by Cross Creek is North's title of senior loan officer and a one-time meeting with Brown. Despite
having the title of senior loan officer, however, Burger admitted that most loan officers do not have the authority to decide
whether to fund a loan. Burger also admitted that when North returned a file that he stated could not be funded because of a
recent bankruptcy, Burger knew there was "a process beyond David North" in obtaining approval.

 Goode testified that North also brought Brown to meet them. Goode testified that Brown stated that North was the senior
loan officer who would handle Cross Creek's deals. With regard to whether Brown stated that North had the ability to
approve loans, Goode was equivocal:

 Q. Okay. Other than his title being senior loan officer, what else gave you the impression that he had the authority to
approve loans?

 A. Everything about him. He said that he was the senior loan officer and that he could get these - he could get those deals
approved.

 He even brought a gentlemen to our office - and here again, I'm short on names. I think it was Mr. Brown, but I can't
swear to that. He brought an official - another officer from First Continental Mortgage that we met with briefly. He also
helped Mr. North to be the - the man.

 Q. That does the approving?

 A. Yeah, he was - he was the senior loan officer and he was the man that was going to handle our deals.

 Q. Okay.

 A. Get our deals approved.

 Q. And he was going to get your deals approved?

 A. Or approve our deals.

 Q. Okay. Now, which was it, though, Mr. Goode?

 A. Approve our deals.

 Q. Mr. Brown said to you, Mr. North will approve your deals?

 A. He is your loan officer.

 Q. Okay. And he will approve your deals, those words came out of his mouth?

 A. To the best of my recollection.



Goode later described the one meeting with Brown as follows:



 Q. Did anyone else with First Continental Mortgage ever visit your office?

 A. As I said earlier, Steve Brown came one time.

 Q. Okay.

 A. Just as a kind of, Hi, how are you, type thing.

 Q. And how long did that meeting last?

 A. Probably 15 minutes.

 Q. And who was in on that meeting?

 A. Sherry and Mike Meyers. Sherry Burger and Mike Meyers.

 Q. Did you personally talk to Mr. Brown?

 A. Yeah, we all talked to him.

 Q. Okay. What was the conversation?

 A. Basically, Hi, I'm - it seemed like he said - I think he said branch manager for the San Antonio branch. I can't swear to
that. Mr. North is the senior loan officer for First Continental Mortgage and he will be handling your account. Basically,
the services they offered such as staged funding, quick turnaround, government type loans, etc., etc.

 Just kind of a general overview of what he did and what they did, and that Mr. North was our loan officer. It was kind of
short and sweet and cordial and professional and that was about it.



Meyers described the meeting as follows:



 Q. So during the first week you were faxing deals to Mr. North, how many times did he come out to y'all's lot?

 A. It seemed like almost every day. He did bring his manager or the office manager or whoever he was up within a couple
of days, I'd say, to meet with us. And I do remember the meeting. It was short. But we basically - I'm 90 percent his name
was Steve Brown. I wouldn't swear to it. But he was out of the San Antonio office and Steve, basically - I guess - I mean, I
looked at it more like a courtesy thing. You know, thank you for the business and we're for real and here's my card, you
know, and Dave is your man, and he will do a good job for you. You know, the things that somebody would say and -

 Q. Who was in on that meeting for Cross Creek?

 A. All of us because he wanted - he's showing his people off. We're showing ours off.

 Q. So Mr. Goode was there?

 A. Oh, yes.

 Q. Ms. Burger was there?

 A. Uh-huh.

 Q. Even though she, I think, testified that she didn't remember that?

 A. She might not have remembered, but I do remember it.

 Q. Now, did you ask the other gentleman about staged funding?

 A. Yes.

 Q. And what was his response?

 A. Staged funding is available.

 Q. And did you ask him about the files that had already been given to Mr. North?

 A. Yes, basically, in total. Not in a specific, you know, Johnny Jones or whatever.

 Q. Okay. So he made no guarantee to you that any particular customer was going to be approved.

 A. No. He told - no.



Meyers later testified that Brown clarified how staged funding worked and that such funding was available.

 No evidence was presented that Brown gave approval for North's alleged financing proposal. Other than stating that North
would be the loan officer who would be in charge of transactions involving Cross Creek, Brown never stated or otherwise
indicated that North had the authority to approve loans or enter into any arrangement guaranteeing the approval of loans. (3) 
The only other evidence relied upon by Cross Creek was North's title of senior loan officer. However, a party dealing with
an agent must ascertain both the fact and the scope of the agent's authority. Disney Enterprises, Inc., 981 S.W.2d at 30. By
dealing with North exclusively on the basis of his job title, Cross Creek did so at its own risk. Id.

 The evidence conclusively established that North did not have actual authority, and no evidence was presented to establish
that North had apparent authority, to make any representation or agreement with regard to the approval of loans for FCM. 
Since all of Cross Creek's claims are dependent upon North having this authority, the trial court did not err in granting
summary judgment in favor of FCM.

Conclusion


 The trial court's judgment is affirmed.

 Phylis J. Speedlin , Justice





1. Staged funding was described as being similar to a construction loan but was used for land/home transactions in which
funding was provided in stages such as when the land was purchased, the utilities were installed, and the manufactured
home was delivered.

2. Although Cross Creek complains of the trial court's order sustaining objections to certain evidence Cross Creek attached
to its summary judgment response, Cross Creek does not cite any of the excluded evidence in support of North's actual or
apparent authority.

3. Goode's testimony that Brown stated that North would approve Cross Creek's deals "[t]o the best of [Goode's]
recollection" was so weak as to no more than create a mere surmise or suspicion of fact in view of Goode's avoidance of the
question when first asked and his previous testimony that Brown stated North would "[g]et our deals approved." See
Forbes, Inc., 124 S.W.3d at 172; see also Madisonville State Bank, N.A. v. Citizens Bank of Texas, N.A., 184 S.W.3d 835,
839 (Tex. App.--Beaumont 2006, no pet.) (concluding equivocal testimony did not constitute more than a scintilla of
evidence); Bush v. Hunter, 469 S.W.2d 655, 656 (Tex. Civ. App.--Waco 1971, no writ) (same). Furthermore, given the
context of the meeting, a single, vague reference by Brown to North being the person who would approve Cross Creek's
deals would not lead a reasonably prudent person using diligence and discretion to suppose North had the authority to
approve Cross Creek's loans on his own. See Disney Enterprises, Inc., 981 S.W.3d at 30.