# IN THE SUPREME COURT OF TEXAS

════════════
No. 14-0293
════════════

JASON R. SEARCY, AS TRUSTEE OF THE EXEMPT ASSETS TRUST,
PETITIONER,

v.

PAREX RESOURCES, INC.,
RESPONDENT

*-consolidated with-*

════════════
No. 14-0295
════════════

JASON R. SEARCY, AS TRUSTEE OF THE EXEMPT ASSETS TRUST,
PETITIONER,

v.

PAREX RESOURCES (BERMUDA), LTD.,
RESPONDENT

══════════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE COURT OF APPEALS
FOR THE FOURTEENTH DISTRICT OF TEXAS
══════════════════════════════════════════════════

JUSTICE GUZMAN, joined by JUSTICE BOYD, concurring in part and dissenting in part.

**Fortuitous:**
happening by chance or accident; occurring unexpectedly, or without known cause; occurring without deliberate intention; accidental.

*Synonym*s: chance, adventitious, unexpected, casual, incidental, fluky, odd, inadvertent, unintentional, unintended, unplanned, unpremeditated, unwitting.

*Antonyms*: deliberate, intended, intentional, planned.[1]

 

Parex Canada's contacts with Texas were anything but fortuitous.[2] Parex Canada intentionally, knowingly, and purposefully engaged in repeated contacts with Texas to negotiate a share purchase agreement, and the fallout from those negotiations was directly tied to this forum. In fact, Texas is the focal point of both the contacts and the alleged harm. Yet the Court disregards Parex Canada's purposeful availment of the forum to engage in protracted business negotiations as qualitatively inconsequential while focusing its substantive discussion on contacts that are jurisdictionally irrelevant—the plaintiff's, Nabors,[3] and the assets that are the subject-matter of the contract. The inquiry into the "minimum contacts" necessary to confer specific jurisdiction, however, "focuses on the relationship among the defendant, the forum, and the litigation."[4]

---

[1] BLACK'S LAW DICTIONARY (10th ed. 2014); THE MERRIAM-WEBSTER THESAURUS: NEW EDITION (2005) (cross-referencing to "accidental"); WEBSTER'S NEW INTERNATIONAL DICTIONARY (3d ed. 2002); ROGET'S II THE NEW THESAURUS (1980); WEBSTER'S COLLEGIATE THESAURUS (1976); WEBSTER'S NEW DICTIONARY OF SYNONYMS (1973); WEBSTER'S NEW INTERNATIONAL DICTIONARY (2d ed. 1953).

[2] "Parex Canada" refers to Parex Resources, Inc.

[3] "Nabors" refers to the Nabors entities, including Nabors Industries, Ltd.; Nabors Industries, Inc.; Nabors Corporate Services, Inc.; and Nabors Global Holdings II. We need not distinguish among the various Nabors entities for purposes of the jurisdictional analysis because Nabors Corporate Services provided management and other professional services to the affiliated Nabors entities from its Houston offices and Parex Canada's relevant communications were directed to Nabors's Houston office.

[4] *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984)).

Affording due deference to the trial court's implied findings, as we are required to do, Parex Canada's purposeful negotiation and bidding activities in Texas constitute minimum contacts conferring specific jurisdiction over Parex Canada for claims arising from those activities. Because the Court holds that Parex Canada need not appear in a Texas court to answer claims arising directly from its purposeful forum-state conduct, I respectfully dissent.

The lynchpin of specific personal jurisdiction is purposeful availment, which centers on a defendant's intentional contacts with the forum state. Although the defendant's intentional contacts with Texas were accomplished technologically in this case, the jurisdictional analysis does not depend on whether the defendant's presence in the forum is virtual or physical. In evaluating the existence of specific personal jurisdiction, the determinative questions are (1) whether a nonresident defendant has purposefully conducted an activity in a forum to establish minimum contacts, and (2) whether the cause of action arises from those forum contacts.

Here, Parex Canada deliberately engaged in bidding and negotiation activity in Texas, offering millions of dollars for a unique asset owned by Texas-based Nabors and discussing the possibility of an ongoing, future business relationship between their affiliates. Nabors ended the discussions because of a binding contract with ERG Resources, LLC (ERG), another Texas-based company,[5] but Parex Canada continued to intentionally engage in communications with Nabors; ERG alleges these communications constituted tortious interference. Parex Canada knowingly and purposefully directed numerous emails, attachments, and phone calls into Texas, and thus, the alleged tort occurred in Texas. Accordingly, Parex Canada's Texas communications constitute

[5] For convenience, I join the Court in referring to both ERG and Jason R. Searcy, the successor to ERG's claims, as ERG.

3

sufficient minimum contacts to support the exercise of specific jurisdiction in accordance with traditional notions of fair play and substantial justice. Because the operative facts of ERG's claim arise from Parex Canada's minimum contacts with Texas, Texas courts have specific jurisdiction over Parex Canada.

The Court disclaims making a distinction between in-person communications and electronically effectuated communications, but its jurisdictional analysis does just that. By basing the jurisdictional analysis on the erroneous premise that Parex Canada's only connection to Texas was Nabors's presence in Texas, the Court ignores the reality that Parex Canada's communications *occurred in Texas*. Unsurprisingly, after characterizing Parex Canada's communications as a connection with Nabors, rather than as a connection with Texas, the Court concludes specific personal jurisdiction over Parex Canada is lacking.

The Court's conclusion thus dismisses emails, attachments, and phone calls as irrelevant jurisdictional contacts, which insulates nonresident tortfeasors from liability for torts committed in Texas as long as the tort is committed through virtual means, rather than in person. Undoubtedly, technology as a substitute for physical presence will persist and technological innovations for communication will surely proliferate as the 21st century progresses, which makes the precedent the Court establishes today an especially troubling and dangerous development in our jurisprudence. Moreover, the Court's analysis and conclusion regarding specific personal jurisdiction places Texas's jurisprudence out of step with other jurisdictions.

Because the Court confounds well-settled precedent and conducts a flawed jurisdictional analysis, I cannot join the Court's holding that the trial court lacked specific jurisdiction over Parex

4

Canada. I agree, however, with the Court's conclusion that the trial court possesses specific jurisdiction over Ramshorn International, Limited (Ramshorn), and lacks jurisdiction over Parex Resources (Bermuda), Ltd. (Parex Bermuda).

## I. Background

The trial court denied Parex Canada's special appearance, concluding it had personal jurisdiction over Parex Canada. Because the trial court made no express fact findings, we imply "all facts necessary to support the judgment [that are] supported by the evidence." *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002). Tellingly, the Court fails to follow the usual convention of articulating the proper standard of review for fact findings, and more importantly, the Court's factual recitation is replete with crucial omissions and impermissible assumptions, which unfortunately permeate the Court's jurisdictional analysis. Accordingly, I begin by setting forth the relevant facts, while affording proper deference to the trial court's implied findings.[6]

In the fall of 2011, Nabors announced its intention to divest many of its exploration-related oil and gas holdings to focus on drilling operations. Nabors's Class A shares of Ramshorn were among the assets Nabors planned to sell, and ERG submitted an initial offer to purchase the shares for $30 million on December 13, 2011. As negotiations between ERG and Nabors proceeded, ERG conducted due diligence on the acquisition by attending a presentation in Colombia and accessing

[6] ERG argues the court of appeals erred by failing to consider all evidence filed with the trial court. Any error is immaterial because, even without considering the additional evidence ERG cites, I conclude Parex Canada established sufficient purposeful contacts with Texas to confer specific jurisdiction. The Court, however, concludes the evidence was insufficient to establish personal jurisdiction over Parex Canada, but it neither identifies the evidence considered, nor addresses ERG's evidentiary arguments.

documents in a virtual data room hosted by a Texas server. On February 17, 2012, ERG increased its offer to $31.5 million. Nabors rejected ERG's offer, and Nabors's head of exploration, Jordan Smith, actively pursued other buyers willing to pay more. But ERG was persistent and made successively increasing offers—$35 million on February 22, 2012, then $39 million on March 7, 2012, and finally $45 million on March 8, 2012; Nabors accepted ERG's $45 million offer and executed a share purchase agreement (SPA) with ERG on March 9, 2012.

Meanwhile, Parex Canada attempted to contact individuals in Colombia to inquire about purchasing the Ramshorn shares, but was unsuccessful in getting a response. In early 2012, Parex Canada contacted Royal Bank of Canada (RBC) for assistance, because RBC had previously acted on Ramshorn's behalf in an earlier transaction.[7] On March 1, 2012, Parex Canada sent an email to

_____

[7] The Court characterizes Nabors as initiating contact with Parex Canada regarding the 2012 sale of the Ramshorn shares because (1) RBC previously assisted Nabors in contacting potential purchasers in 2010 and (2) Smith testified that he requested RBC reach out to the same fifty buyers, including Parex Canada sometime in "early March [2012] . . . towards the end of the first week or beginning of the second week of March." *Ante* at 5-6. Considering this "fact" of who initiated contact as highly significant, the Court views all of Parex Canada's contacts with Nabors "in light of the fact that Nabors reached out to RBC, which in turn notified Parex Canada of the opportunity to acquire shares regarding Colombian assets . . . ." *Id.* at 27 ("Parex Canada also did not initiate the interactions that it eventually had with Nabors. It was Nabors who solicited RBC for its investment banking services in order to find potential buyers of its shares."); *see also id.* at 22 (claiming Parex Canada "only became involved with Nabors after this solicitation").

But evidence also supports a finding that Parex Canada initiated the contact with RBC in 2012, who then assisted Parex Canada in contacting Nabors with a bid for the Ramshorn shares. David Taylor, Parex Canada's Vice President of Exploration and Business Development, explained that Parex Canada initiated contact with RBC in 2012 because they were interested in potentially acquiring Nabors's assets. Taylor testified that:

> somewhere in the first quarter of 2012, **we contacted RBC.** And the reason **we contacted RBC** is because they were acting on behalf of Ramshorn in 2011 when they were undergoing a corporate sale or transaction at the time. So we thought they may be able to help us with a contact.

(Emphases added.) Therefore, I believe we must defer to the trial court's implied finding that Parex Canada purposefully solicited RBC's assistance in negotiating with Nabors regarding the Ramshorn Class A shares in 2012, before RBC was able to contact Parex Canada about the opportunity. *See BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002) (explaining reviewing courts must imply "all facts necessary to support the [trial court's] judgment and supported by the evidence"). Regardless, Nabors ended communications with Parex Canada on March 9, 2012, at which point, Parex Canada reinitiated communications and continued to negotiate and bid in Texas. Importantly, Parex Canada's negotiation and bidding activities in Texas after March 9, 2012, form the basis of ERG's tortious-interference claims.

RBC's Managing Director, Bevin Wirzba, with a letter of intent (LOI) attached. The LOI was dated March 2, 2012, and offered $40 million for the "entire issued share capital of Ramshorn."[8] Wirzba forwarded the LOI to Nabors's head of exploration, Jordan Smith. The following day, Scott Peterson (Nabors's Associate General Counsel) emailed Nicolas Marot (Parex Canada's Manager of New Ventures), David Taylor (Parex Canada's Vice President of Exploration and Business Development), and Wirzba to express gratitude for the offer and to clarify that only the Class A shares of Ramshorn were available for acquisition.[9] To illustrate the transaction structure Nabors envisioned, Peterson attached a draft SPA to the email, which stated the transaction would close at Nabors's offices in Houston, Texas. Peterson also offered to provide additional details about the assets if Parex Canada would sign a confidentiality agreement that was attached to his email. The confidentiality agreement included a Texas choice-of-law provision and a Harris County, Texas, venue-selection clause. Shortly thereafter, Parex Canada signed a modified version of the confidentiality agreement that changed the venue and choice-of-law provisions to New York. Rather than immediately suggesting any changes to the draft SPA, however, Parex Canada indicated it was "working on the SPA right now" and requested that Nabors's chief financial officer, Bruce McConnell, contact Parex Canada's chief financial officer, Ken Pinsky.

On March 3, 2012, Parex Canada contracted with RBC for Wirzba to provide advice regarding the potential acquisition of Nabors's Ramshorn shares and to negotiate with Nabors on its

---

[8] Parex Canada executed two March 2, 2012 LOIs that were identical, except one was addressed to RBC Capital Markets in Calgary, Canada and one was addressed to Ramshorn Investments Inc.'s Houston office. The LOIs were sent by Parex Canada on behalf of one of its subsidiaries, Parex Resources (Colombia) Ltd. (Parex Colombia).

[9] The signature block on Scott Peterson's emails stated his position as "Associate General Counsel" for "NABORS CORPORATE SERVICES, INC." at "515 W. Greens Rd., Suite 1200, Houston, TX 77067."

behalf. Wirzba did just that, emailing a revised LOI and $40 million offer to Nabors's Houston office on March 6, 2012, the day after Wirzba discussed the transaction with Nabors's Vice President and General Counsel, Laura Doerre.[10] On March 7, 2012, after learning that Nabors was "marching down the path with another party," Wirzba increased the offer to $50 million, removed financing conditions, and offered additional incentives for acceptance, including shortening the due-diligence period and making a $3 million deposit. While Nabors was considering the offer, Parex Canada was granted access to the virtual data room in Houston so it could conduct due diligence.[11] Continuing the negotiations, Wirzba informed Nabors on March 8, 2012, that Parex Canada was willing to include a provision in the SPA granting Nabors the right and option to provide drilling rigs following the sale's consummation.

However, the very next day, March 9, 2012, Nabors accepted ERG's increased offer of $45 million for the Ramshorn Class A shares. Peterson informed Wirzba and Taylor by telephone and email that Nabors had executed an SPA with ERG, but also stated he would reinitiate contact if the deal with ERG failed to close. Evidence supports the trial court's implied finding that, as of March 9, 2012, Parex Canada knew that Nabors had a deal with Texas-based ERG for $45 million that was set to close on March 15, 2012.[12]

_____

[10] The LOI was again sent on behalf of Parex Colombia.

[11] The record shows that upon receiving due-diligence request lists from potential purchasers, Nabors's Houston, Texas employees would upload data to the virtual data room, which was housed on Houston-based servers.

[12] One Nabors executive testified that "[o]n March 9th, Nabors advised Parex that it had entered into [an] SPA with ERG and was scheduled to close that transaction on March 15." Another Nabors executive testified that Parex Canada was informed "that [Nabors] had a deal with somebody else and that it was scheduled to close the next week"; a Parex Canada executive conceded that the term "deal" implies a binding contract. Furthermore, a Parex Canada executive admitted he had heard "rumours that there were other parties involved in discussions" by March 6, 2012 and testified there were "no secrets" in Colombia.

The court of appeals likewise deferred to "the trial court's implicit finding that Parex Canada knew on March

8

In response to Peterson's March 9 email explaining Nabors had made a deal with another buyer, Wirzba asked Nabors to "reconsider [Parex Canada's] proposal at a level of $55 million." Wirzba followed up with Peterson by telephone, leaving him a voicemail requesting information about the status of Nabors's executed SPA. Peterson responded to Wirzba via email: "To answer your question, things are proceeding apace with our counterparty under the SPA. I'll let you know if that changes." Despite Peterson's reminder that Nabors had already executed an SPA, Wirzba sent a responsive email in which he continued to press Parex Canada's higher offer, stating, "I presume the extra $5mm didn't convince you to terminate discussions." Peterson countered, "It's the fact it was already signed that caused the rejection. $5mm is always attractive (when we're in a position for it to be!)."[13] Notwithstanding the vehement reminder that Nabors had a contractual commitment to ERG, Parex Canada persisted in conducting due diligence, accessing information from the Houston-based virtual data room, and communicating with Nabors's Houston-based staff to request additional data be uploaded to the server for Parex Canada's review.

Disregarding Peterson's earlier assurances that Parex Canada would be notified if the sale of Nabors's Class A Ramshorn shares fell through, Wirzba once again initiated contact with Peterson in Houston. Wirzba called Peterson on March 16, 2012, to inquire about the deal's status. Peterson

9, 2012 that ERG was the counterparty." 427 S.W.3d at 422. Nonetheless, the Court evidently rejects the trial court's implied finding on this point. Instead, the Court emphasizes the "parties dispute when exactly Parex Canada's executives came to know about the ERG SPA," *ante* at 8, and vaguely concludes "Parex Canada did not find out that ERG was a potential counterparty to Nabors Global for purchase of the relevant assets until a relatively late stage in the deal," *id.* at 27; *see also id.* at 22 ("ERG, of whom Parex Canada did not know until relatively late in its negotiations, turned out to be incorporated and headquartered in Texas.").

[13] In his deposition, Peterson testified that "[h]aving signed the other agreement, there was no point in having a further discussion with Mr. Wirzba," which is why Peterson informed Wirzba that Nabors was "[not] interested in any additional money at that point."

9

informed Wirzba that the deal did not close on March 15, but an extension was in the works. During the phone call, Wirzba alluded to Parex Canada's willingness to increase the offer and about twenty minutes later emailed an increased offer of $75 million to Nabors's executives (Peterson, Doerre, Smith, and McConnell). The email stated:

> [W]e understand that your counterparty on the Ramshorn Colombia transaction has not yet closed the transaction. We also understand that you had originally given them until the 15th of March to close the transaction. Our client (Parex Resources) will be sending you, within the hour, a signed LOI for the interests with an increased revised offer of $75MM with an effective date of February 29th. As demonstrated over the past 3 weeks, we have been committed to seeing this transaction through, and believe that this revised offer is a material increase that should be considered by your organization.

Pinsky, Parex Canada's chief financial officer, subsequently emailed Nabors a revised LOI addressed to Nabors's Houston office, detailing a subsidiary's intention to purchase Nabors's Class A shares for $75 million. Less than an hour later, Pinsky sent Nabors another email to express his understanding that "a client relationship may be part of [Nabors's] decision on the sale of [Nabors's] Ramshorn interest" and assured Nabors that Parex Canada "[was] ready and able to serve notice for termination on a current contract and enter into good faith negotiations with Nabors Colombia."

The same day, ERG and Nabors amended the SPA to extend the closing date to March 19, 2012, with an effective date of March 15, 2012. Accordingly, Doerre explained to Wirzba that the deal with ERG had not closed or terminated and the closing had been extended to the following Monday. Doerre thanked Wirzba for the "continued interest" and assured him that he would be promptly notified if Nabors would be "in a position to entertain a proposal from [Wirzba's] client."[14]

---

[14] Laura Doerre's emails included a signature block stating her position as "Vice President and General Counsel" at "NABORS CORPORATE SERVICES, INC." located at "515 W. Greens Rd., Suite 1200, Houston, TX 77067."

Additionally, Doerre instructed Wirzba that any offer "would need to be in substantially the form of the attached draft agreement," which set Houston as the closing location, included a Harris County, Texas venue-selection clause, and specified the agreement would be governed by Texas law.

According to ERG, Nabors refused to close on the morning of Monday, March 19, 2012, despite ERG's tendered performance. Around 3 p.m., Nabors suggested to ERG via email that the missed closing should end the negotiations; however, ERG never signed a proposed termination agreement Nabors faxed to ERG a couple hours later.

Meanwhile, rather than waiting to hear from Nabors, Pinsky emailed Peterson on the afternoon of March 19 to inquire if the deal had closed. A few hours later, Wirzba also sent a follow-up email, asking Peterson and Smith if the deal had closed. Nabors did not respond. Consequently, on March 20, Pinsky again emailed Peterson, requesting a call concerning the Ramshorn shares. Pinsky stated that Parex Canada was "more qualified to close and honor any future covenants" and he wished to "discuss the number directly with Nabors with a view to making an increased offer." Wirzba also emailed Nabors's vice president and general counsel on March 20 to emphasize Parex Canada's desire to discuss "next steps" if the transaction had not closed.

The same day, ERG sued several entities, including Nabors and Parex Canada, alleging Parex Canada tortiously interfered with ERG's purchase agreement with Nabors and seeking specific performance of the agreement. The next day, Pinsky resubmitted an LOI offering $75 million for Nabors's Class A shares addressed to Nabors's Houston office; once again, the proposed purchaser was Parex Colombia. The sale was temporarily restricted by an injunction issued by a Bermuda court, but the injunction was discharged on April 5, 2012.

11

On April 9, 2012, Parex Canada formed a new subsidiary, Parex Bermuda, to execute an SPA with Nabors regarding the Class A Ramshorn shares. An SPA between Parex Bermuda and Nabors was executed on April 12, 2012. On April 17, 2012, the Parex Bermuda board ratified the acquisition of Ramshorn's Class A shares, and ERG subsequently added Parex Bermuda as a defendant in its tortious-interference suit.

## II. Discussion

Texas's long-arm statute "extends Texas courts' personal jurisdiction 'as far as the federal constitutional requirements of due process will permit.'" *BMC Software*, 83 S.W.3d at 795 (quoting *U-Anchor Adver., Inc. v. Burt*, 553 S.W.2d 760, 762 (Tex. 1977)). "For a State to exercise [specific personal] jurisdiction consistent with due-process, the defendant's suit-related conduct must create a substantial connection with the forum State." *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014). In other words, courts usually can exercise specific personal jurisdiction consistent with traditional notions of fair play and substantial justice "when (1) the defendant's contacts with the forum state are purposeful, and (2) the cause of action arises from or relates to the defendant's contacts." *Spir Star AG v. Kimich*, 310 S.W.3d 868, 873 (Tex. 2012).

### A. Specific Personal Jurisdiction Over Parex Canada Exists

Applying the proper deferential standard of review to the trial court's judgment, I would hold specific jurisdiction exists over Parex Canada. Parex Canada purposely directed contacts into Texas to bid on a multi-million-dollar asset transaction and to explore the possibility of an ongoing, future business relationship between Parex Canada's affiliates and Nabors's affiliates with Texas operations; thus, even if the asset owner's presence in Texas was merely "coincidental" or a "mere

12

accident," Parex Canada's contacts with Texas were not. *Ante* at 22, 28. Parex Canada deliberately engaged in negotiation and bidding activities in Texas through technological instrumentalities, and ERG's cause of action arises from those Texas-based activities. Specific jurisdiction therefore exists over Parex Canada because (1) Parex Canada engaged in purposeful contact with Texas, (2) the cause of action arises directly from that contact, and (3) exercising jurisdiction over Parex Canada comports with traditional notions of fair play and substantial justice.[15] Recognizing Parex Canada's purposeful contacts with Texas as giving rise to specific jurisdiction also accords with binding United States Supreme Court precedent and prevents Texas from becoming a jurisprudential outlier on personal jurisdiction.

### 1. Sufficient and Purposeful Contacts with Texas

"Where a defendant 'purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws,' it submits to the judicial power of an otherwise foreign sovereign to the extent that power is exercised in connection with the defendant's activities touching on the State." *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 881 (2011) (plurality op.) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). By intentionally conducting an activity within a state, a defendant has necessarily invoked the benefits and protections of its laws and is subject to the State's jurisdiction for claims arising from the in-state activity. *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945) ("[T]o the extent that a corporation exercises

---

[15] Whether Parex Canada's contacts with the forum were sufficient to confer general jurisdiction is, therefore, immaterial.

the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state.").[16]

Recently, the Supreme Court further explained that "[a] forum State's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on intentional conduct by the defendant that creates the necessary contacts with the forum." *Walden*, 134 S. Ct. at 1123. Thus, a defendant's contacts with the forum must result from the defendant's conduct,[17] not the unilateral actions of a plaintiff or a third party.[18] A defendant must *choose* to create contacts with Texas for Texas courts

---

[16] Accordingly, the test is purposeful availment *of the forum*, not purposeful availment *of the forum law*, as it is mistakenly articulated by the Court. *See ante* at 26 ("purposeful availment of Texas law").

[17] Although a defendant's contacts with a forum-state resident are not wholly irrelevant, the focus of the inquiry is on "the defendant's contacts with the forum State itself." *See Walden*, 134 S. Ct. at 1122; *see also TV Azteca S.A.B. de C.V. v. Ruiz*, ___ S.W.3d ___, 2016 WL 766927, at *8 (Tex. 2016) ("[T]he fact that the plaintiff lives and was injured in the forum state is not irrelevant to the jurisdictional inquiry, but it is relevant only to the extent that it shows that *the forum state* was 'the focus of the activities of the defendant.'" (quoting *Keeton*, 465 U.S. at 780)); *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 157 (Tex. 2013) ("The focus is properly on the extent of the defendant's activities in the forum, not the residence of the plaintiff."). A defendant thus lacks minimum contacts with the forum state if a nonresident's only contact with the forum is injury to a forum-state resident arising from contacts *outside* the forum state, *Walden*, 134 S. Ct. at 1124-25, or if a nonresident's only contact with the forum is selling an item to a forum-state resident *outside* the forum state, *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 787-88 (Tex. 2005).

[18] *See Walden*, 134 S. Ct. at 1122 (explaining that in *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980), the Oklahoma courts lacked "personal jurisdiction over an automobile distributor that supplies New York, New Jersey, and Connecticut dealers based only on an automobile purchaser's act of driving it on Oklahoma highways"); *Moncrief Oil*, 414 S.W.3d at 152 (describing *Michiana* as holding that receiving a phone call from Texas and "transferring the vehicle to the shipper the buyer had designated to transport the vehicle to Texas" did not "constitute[] purposeful availment because the dealer 'had no say in the matter'"); *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 340 (Tex. 2009) (explaining the defendant's "contacts with Texas were also not the result of the unilateral actions of a third party," but rather the defendant "was a willing participant" in the transaction giving rise to the cause of action); *Michiana*, 168 S.W.3d at 794 (concluding there was no specific jurisdiction "[b]ecause Michiana's only contact with Texas was [the plaintiff's] decision to place his order from there").

14

to have specific jurisdiction over claims stemming from those contacts,[19] but the defendant's subjective intent or reasoning behind its decision to establish those contacts is irrelevant.[20]

A defendant can choose to avoid creating contacts with a forum state, such as by "purposefully structur[ing] transactions to avoid the benefits and protections of a forum's laws." *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 808 (Tex. 2002); *see also Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 792 (Tex. 2005) (explaining the insertion or deletion of forum-selection clauses can provide some evidence regarding the parties' intent to be or not to be subject to local jurisdictions). But inserting a choice-of-law or forum-selection provision into a contract with a forum-state resident will not negate intentional contact with the forum state. *See Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 154 (Tex. 2013) (recognizing that defendants' "subjective intent does not negate their business contacts"); *see also Michiana*, 168 S.W.3d at 792 ("Generally, a forum-selection clause operates as consent to jurisdiction in one forum, not proof that the Constitution would allow no other."). Thus, defendants cannot insulate themselves from liability for a tort committed in Texas against a Texas resident simply by including a provision in a third-party contract stipulating another forum, especially when the tort claim does not arise from the contract.[21]

---

[19] *See Moncrief Oil*, 414 S.W.3d at 153 ("They were not unilaterally haled into forming contacts with Texas; rather, they agreed to attend Texas meetings.").

[20] *See id.* at 147 ("The defendants claim their intent in attending the meetings was to discuss an unrelated matter . . . [b]ut what the parties thought, said, or intended is generally irrelevant to their jurisdictional contacts.").

[21] Although Parex Canada may have attempted to structure its transaction to avoid being subject to jurisdiction in Texas, ERG's claims arise from Parex Canada's purposeful Texas communications, not from the subsequently executed transaction between Nabors and Parex Bermuda that contained New York forum-selection and choice-of-law provisions. Furthermore, while the executed SPA included New York provisions, the forum-selection and choice-of-law provisions in the SPA drafts exchanged during this time differed, with some selecting Texas, rather than New York.

Although a defendant's contacts with a forum must be intentional, *Walden*, 134 S. Ct. at 1123, a defendant need not "*physically* enter the forum State" to establish minimum contacts, *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985); *see also Walden*, 134 S. Ct. at 1121 (recognizing that "a nonresident's physical presence within the territorial jurisdiction of the court is not required" to give rise to specific jurisdiction). Directing communications into a forum state can constitute sufficient minimum contacts with a jurisdiction. *See Burger King*, 471 U.S. at 476 ("[I]t is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted."). Therefore, when conducting business and activities in a forum, defendants cannot hide behind technological instrumentalities to avoid the consequences of their purposeful contacts with the forum. *See Retamco*, 278 S.W.3d at 339 ("[W]hile [the nonresident defendant] may not have actually entered the state to purchase this real property, '[j]urisdiction . . . may not be avoided merely because the defendant did not physically enter the forum state.'" (quoting *Burger King*, 471 U.S. at 476)).

Attempting to acquire Nabors's Ramshorn Class A shares, Parex Canada "purposefully avail[ed] itself of the privilege of conducting [the negotiation and bidding] activities within [Texas], thus invoking the benefits and protections of its laws," and subjecting itself to Texas jurisdiction for claims arising from those activities. *See Hanson*, 357 U.S. at 253. Parex Canada initiated contact

---

Regardless, a "forum-selection clause . . . [is] not proof that the Constitution would allow no other [forum]," and in any event, ERG would not be bound by an agreement between Nabors and the Parex entities. *See Michiana*, 168 S.W.3d at 792. Consequently, the Court's focus on the later-executed contract between Parex Bermuda and Nabors is misplaced.

with RBC and Nabors in 2012[22] and intentionally communicated with Nabors in Texas regarding the purchase of a unique asset and the possibility of future business relationships between affiliates, as illustrated by the inclusion of a "Right and Option to Provide Drilling Rigs" provision of a draft SPA.[23]  *See Burger King*, 471 U.S. at 479 (recognizing the relevance of negotiations and contemplated future interactions); *cf. Michiana*, 168 S.W.3d at 794 (defendant seller's only contact with Texas was *responding* to a purchaser's offer).

Although the ubiquity of cell phones means area codes "no longer necessarily indicate[] anything about the caller's location," *Michiana*, 168 S.W.3d at 791, the evidence supports a finding that Parex Canada knew it was directing phone calls to Texas.[24]  Furthermore, Parex Canada's emails

---

[22] In cases involving claims between contracting parties, courts have found whether the nonresident was a passive purchaser versus an active solicitor or negotiator to be relevant in determining the existence of personal jurisdiction. *Compare Sloss Indus. Corp. v. Eurisol*, 488 F.3d 922, 933 (11th Cir. 2007) ("In our view, [the nonresident defendant] was more than a mere passive purchaser, and the exercise of specific jurisdiction by the district court did not offend the Due Process Clause."), *with Vetrotex Certainteed Corp. v. Consol. Fiber Glass Prods. Co.*, 75 F.3d 147, 152 (3d Cir. 1996) (holding no purposeful availment where the nonresident defendant "was merely a 'passive buyer' of [the plaintiff's] product").

[23] Even a small sampling of the deliberate contacts Parex Canada established with Texas during the time Nabors had a signed contract with ERG demonstrates purposeful availment:  (1) accessing due-diligence documents in a virtual data room administered in Houston and communicating with individuals working in Houston to facilitate access to additional data; (2) sending an email to Houston-based Peterson, urging Nabors to reconsider a $55 million offer; (3) placing a phone call and leaving a voicemail message to a Houston number inquiring about the status of Nabors's contract with ERG; (4) sending an email to Houston-based Peterson, emphasizing that Parex Canada was offering an additional $5 million; (5) placing a phone call to a Houston telephone number alluding to Parex Canada's willingness to increase its offer; (6) sending an email to Houston-based Nabors executives, offering $75 million and emphasizing the level of commitment demonstrated over the "past 3 weeks"; (7) sending an email to Houston-based Nabors executives with a revised LOI addressed to Nabors's Houston office; and (8) sending an email to Houston-based Nabors executives to express Parex Canada's willingness to enter into a contract with Nabors's subsidiary if a client relationship would be a factor in Nabors's decision regarding the sale of its Ramshorn shares.

[24] 427 S.W.3d at 422 & n.14 (noting the evidence suggests "Parex Canada knew it was negotiating with Nabors-related individuals located in Texas"); *see also Internet Sols. Corp. v. Marshall*, 39 So.3d 1201, 1208 (Fla. 2010) ("The determination of whether certain acts constitute communications into Florida is straightforward when the case concerns telephonic communications, written communications, or electronic communications in the form of e-mails or facsimiles, because those communications are directed to reach a specific recipient in a specific forum; in other words, it is clear that the nonresident defendant's communications were made into Florida.").

and attachments were expressly addressed to locations in Texas. On March 2, March 6, and March 16, 2012, Parex Canada sent LOIs to Nabors that were addressed to Nabors's Houston office. The signature blocks on Nabors's email replies to Parex Canada's repeated bids also contained Nabors's Houston address, further highlighting that Parex Canada purposefully conducted its bidding and negotiating in Texas—it was not "unilaterally haled into forming Texas contacts." *See Moncrief Oil*, 414 S.W.3d at 153.

Recently, the United States Supreme Court again recognized that "physical presence in the forum is not a prerequisite to jurisdiction," but noted that "physical entry into the State—either by the defendant in person or through an agent, goods, mail or some other means—is certainly a relevant contact." *Walden*, 134 S. Ct. at 1122. Although the Supreme Court reserved "questions about virtual contacts for another day," *see id.* at 1125 n.9, logic dictates that an email with an attachment addressed to a specific address be considered analogous to physical mail. As such, the emails that Parex Canada sent to Nabors with attachments addressed to a Houston address are relevant jurisdictional contacts.

The Court, however, fails to recognize Parex Canada conducted its negotiation and bidding activities *in Texas* through electronic means[25] and instead concludes specific personal jurisdiction is lacking because the "assets that Parex Canada wanted to buy happened to be owned by a Bermudian company which had some Texas operations." *Ante* at 28. The Court thus erroneously grounds its analysis on Nabors's "coincidental presence in Texas" and on Parex Canada's presumed

_____

[25] Although the Court denies making a distinction between virtual and in-person communications, *ante* at 24, the analysis the Court employs tells a different story, *see id.* at 23 (distinguishing *Calder* on the basis that the tort occurred in the forum state). Moreover, the Court never identifies where it believes the negotiation and bidding activity occurred.

intent, *id.* at 22, rather than Parex Canada's purposeful conduct—deciding to negotiate in Texas with Nabors.[26] *See Moncrief Oil*, 414 S.W.3d at 153 (agreeing to attend Texas meetings constituted purposeful availment). Although bidding for Nabors's Colombian assets could have occurred anywhere, it actually occurred in Texas, subjecting parties to the jurisdiction of Texas courts for claims arising from the bidding activities. Similarly, a nonresident defendant who assaults a nonresident plaintiff in Texas is subject to Texas jurisdiction for claims arising from the assault, even though the plaintiff's presence in Texas when the assault occurred is merely "fortuitous." *Cf. id.* at 154 (a nonresident driving through Texas who gets in a vehicular accident in Texas is subject to Texas jurisdiction for claims stemming from that accident).

The Court's focus on the location of the negotiated assets is similarly unwarranted—whether the assets were located in Midland, rather than Colombia, does not alter the jurisdictional analysis in this case. "The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant 'focuses on the relationship among the defendant, the forum, and the litigation.'" *Walden*, 134 S. Ct. at 1121 (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984)).[27] Because the litigation here involves a tortious-interference claim, the focus of the jurisdictional analysis is the relationship among Parex Canada, Texas, and Parex Canada's communications with Nabors that

---

[26] The Court claims Parex Canada was "striving to expand its Colombian portfolio," not "attempting to meddle with a contract governed by Texas law." *Ante* at 22; *see also id*. (concluding Parex Canada lacked "any desire to launch or maintain operations in Texas"). But subjective intent "does not negate [a defendant's] business contacts." *Moncrief Oil*, 414 S.W.3d at 154. Parex Canada may not have intended to submit to the jurisdiction of Texas courts, but "it is the defendant's actions, not his expectations, that empower a State's courts to subject him to judgment." *See J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 883 (2011) (plurality op.).

[27] Nor is ERG asking the Court to exercise *in rem* jurisdiction. *See Hanson v. Denckla*, 357 U.S. 235, 246 (1958) ("The basis of [*in rem*] jurisdiction is the presence of the subject property within the territorial jurisdiction of the forum State.").

allegedly tortiously interfered with ERG's Texas-based contract. Therefore, Parex Canada's purposeful negotiation and bidding activities in Texas constitute minimum contacts conferring specific jurisdiction on Parex Canada for claims arising from those activities.

### 2. Texas Contacts Substantially Connected to Operative Facts

Exercising personal jurisdiction over a nonresident defendant requires more than sufficient minimum contacts with the forum. Rather, "[s]pecific jurisdiction exists only if the alleged liability arises out of or is related to the defendant's activity within the forum." *Moncrief Oil*, 414 S.W.3d at 156; *see Spir Star*, 310 S.W.3d at 873 (specific jurisdiction exists when a "cause of action arises from or relates to the defendant's [purposeful] contacts" with the forum state). The relationship between the alleged liability and the defendant's contacts with the forum cannot be too attenuated; "there must be a substantial connection between those contacts and the operative facts of the litigation." *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 584-85 (Tex. 2007).

When the defendant's contacts with Texas are merely peripheral to a cause of action, specific jurisdiction is lacking; a nonresident defendant cannot be deprived of due process through artful pleading. Such was the case in *Moki Mac*, in which we held specific jurisdiction was lacking in a wrongful-death suit against a Utah-based river-rafting outfitter. *Id.* at 573. That suit arose from a Texas teenager's death while hiking in Arizona, and the only alleged contact the Utah rafting company had with Texas was mailing documents to the teenager's parents in Texas. *See id.* at 573, 576. The pleadings alleged certain misrepresentations in the Utah company's materials regarding safety caused the parents to send their son on the trip, but we held the wrongful-death suit

"concern[ed] principally the guides' conduct of the hiking expedition and whether they exercised reasonable care," which occurred solely in Arizona. *See id.* at 585.

Likewise, in *Moncrief Oil*, we held a tortious-interference claim was not substantially connected to the defendants' Texas contacts. *See* 414 S.W.3d at 157-58. Moncrief alleged its tortious-interference claim arose from the defendants' misappropriation of trade secrets in Texas, because the misappropriated secrets were used to create a competing enterprise and that enterprise interfered with Moncrief's business relationship with another company. *See id.* at 157. In declining to exercise personal jurisdiction over the defendants, we found the connection between the alleged tort and the contacts with Texas too insubstantial to sustain specific jurisdiction, because the tortious-interference claim centered on communications that occurred at a California meeting and the creation of a competing enterprise by another company, "not the purported misappropriation of alleged trade secrets." *Id.* In other words, the contact was peripheral to the substantial basis of the claim.

In contrast, we concluded the defendants' contacts with Texas were substantially connected to Moncrief's misappropriation-of-trade-secrets claim to give rise to specific jurisdiction as to that claim. *See id.* at 153. The alleged misappropriation of trade secrets occurred at a meeting the defendants attended in Texas; hence, the alleged liability arose directly from the defendants' contacts with Texas. *Id.* at 153.[28] As *Moncrief Oil* illustrates, if a nonresident defendant's purposeful activities within Texas are the crux of the tort claim, Texas courts have personal jurisdiction over

[28] Although the information received at the Texas meetings might not have ultimately constituted trade secrets, we recognized that was a merits issue, which would be inappropriate to consider at the jurisdiction stage. *See Moncrief Oil*, 414 S.W.3d at 156 n.15.

the defendant to adjudicate that claim if doing so otherwise comports with traditional notions of fair play and substantial justice. *See id.* at 154; *cf. Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 661 (Tex. 2010) (explaining the appellate court erred by allowing a "fraud claim to proceed despite the lack of allegations and evidence that any part of the claim originates from the Officers' conduct in Texas").

Here, Parex Canada's purposeful bidding activities in Texas gave rise to ERG's cause of action—Parex Canada's "alleged liability arises out of [and] is related to [Parex Canada's] activity within [Texas]." *See Moncrief Oil*, 414 S.W.3d at 156. To establish its tortious-interference claim, ERG will have to prove "(1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract, (3) that proximately caused [its] injury, and (4) caused actual damages or loss." *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000).[29] Consequently, Parex Canada's bidding activities in Texas are substantially connected to the operative facts of the litigation.

The operative facts of ERG's claim revolve around Parex Canada's communications with Nabors in Texas—whether those emails and phone calls constitute "willful and intentional act[s] of interference" and "proximately caused [ERG's] injury." *See id.* Additionally, any dispute regarding

---

[29] Identifying the elements of a tortious-interference claim and assessing the relationship between those elements and the alleged activity in Texas does not constitute a merits inquiry, *see ante* at 16-17, but rather represents the proper analysis in assessing whether a "substantial connection" exists between a defendant's forum "contacts and the operative facts of the litigation," *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 585 (Tex. 2007). *See also Walden*, 134 S. Ct. at 1121 ("For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State."); *id.* ("The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant 'focuses on the relationship among the defendant, the forum, and the litigation.'" (quoting *Keeton*, 465 U.S. at 775)). Parex Canada's communications may ultimately fail to constitute an "intentional act of interference," *Prudential Ins.*, 29 S.W.3d at 77, or ERG could fail to establish another element of its tortious-interference claim; however, the merits of ERG's claims are irrelevant to our jurisdictional inquiry. *See Moncrief Oil*, 414 S.W.3d at 156 n.15.

the first and fourth element of a tortious-interference claim will also be Texas-focused because the "contract subject to interference" was a Texas contract and any "actual damages or loss" that ERG suffered would be in Texas. *See id.* at 77-78. Unlike *Moki Mac*, where the defendants' activities in Texas were too attenuated from the plaintiff's claims to confer specific jurisdiction, *see* 221 S.W.3d at 585, Parex Canada's activities in Texas are substantially connected to the operative facts of ERG's tortious-interference claim. Because Parex Canada's purposeful, and allegedly tortious, conduct occurred in Texas and is at the very core of ERG's suit, the exercise of specific personal jurisdiction over Parex Canada by Texas courts is proper as long as it does not otherwise offend traditional notions of fair play and substantial justice.[30]

### 3. Exercising Specific Jurisdiction Comports with Fair Play and Substantial Justice

When a "nonresident has minimum contacts with the forum, rarely will the exercise of jurisdiction over the nonresident not comport with traditional notions of fair play and substantial justice." *Moncrief Oil*, 414 S.W.3d at 154-55. In evaluating whether exercising jurisdiction over a defendant with minimum contacts would be unreasonable, we consider: "(1) the burden on the defendant; (2) the interests of the forum in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the international judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several nations in furthering fundamental substantive social policies." *Id.* at 155. A forum state will usually have "a

---

[30] *See Walden*, 134 S. Ct. at 1124 (clarifying that in *Calder*, California courts had jurisdiction because "the defendants' intentional tort actually occurred *in* California"); *cf. id.* at 1119 (Nevada courts lacked jurisdiction over nonresident defendant whose "allegedly tortious conduct in Georgia . . . delay[ed] the return of funds to plaintiffs with connections to Nevada"); *Hanson*, 357 U.S. at 251 ("The cause of action in this case is not one that arises out of an act done or transaction consummated in the forum State."); *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 661 (Tex. 2010) (holding the court of appeals erred in allowing a "fraud claim to proceed despite the lack of allegations and evidence that any part of the claim originates from the Officers' conduct in Texas").

'manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors." *Burger King*, 471 U.S. at 473; *see also Keeton*, 465 U.S. at 776 ("And it is beyond dispute that [a state] has a significant interest in redressing injuries that actually occur within the State.").

The trial court's exercise of specific jurisdiction over Parex Canada does not offend traditional notions of fair play and substantial justice. Although subjecting Parex Canada to suit imposes some burden, "[d]istance alone cannot ordinarily defeat jurisdiction." *Moncrief Oil*, 414 S.W.3d at 155. Parex Canada frequents Texas and even hosted a management meeting in Houston in 2012. Moreover, Texas has a strong interest in adjudicating the underlying suit as it involves allegations of an intentional tort that occurred in Texas and injured a Texas resident. *See id.*; *see also Burger King*, 471 U.S. at 473; *Keeton*, 465 U.S. at 776. Finally, exercising jurisdiction over Parex Canada furthers the "judicial system's interest in obtaining the most efficient resolution of controversies," as it allows all of ERG's related claims to be tried together. *See Moncrief Oil*, 414 S.W.3d at 155.

### 4. Consistency with Other Jurisdictions

Exercising specific jurisdiction over Parex Canada also aligns with precedent from federal courts. *See BMC Software*, 83 S.W.3d at 795 (relying on "precedent from the United States Supreme Court and other federal courts, as well as our own State's decisions, in determining whether a nonresident defendant has met its burden to negate all bases of jurisdiction"). Federal circuits have found specific jurisdiction when communications are dispatched to a forum state and a tort claim arises from those communications. *See, e.g.*, *Felland v. Clifton*, 682 F.3d 665, 670 (7th Cir. 2012)

(concluding Wisconsin had specific jurisdiction to consider a plaintiff's intentional tort claim that arose from multiple communications the defendant directed to Wisconsin); *Schneider v. Hardesty*, 669 F.3d 693, 702-03 (6th Cir. 2012) (letters mailed to Ohio constituted purposeful availment); *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1067, 1075-76 (10th Cir. 2008) (sending a notice of claimed infringement to eBay in California to suspend plaintiffs' auction in Colorado and sending an email to plaintiffs in Colorado threatening litigation subjected defendants to personal jurisdiction in Colorado); *Oriental Trading Co. v. Firetti*, 236 F.3d 938, 943 (8th Cir. 2001) (sending fraudulent communications, in the form of phone calls, faxes, and invoices into Nebraska conferred specific jurisdiction); *Neal v. Janssen*, 270 F.3d 328, 332-33 (6th Cir. 2001) (making phone calls to Tennessee and sending faxes to Tennessee constituted purposeful availment); *Vishay Intertechnology, Inc. v. Delta Int'l Corp.*, 696 F.2d 1062, 1068-69 (4th Cir. 1982) (finding specific jurisdiction when the defendant "wrote three letters and initiated five telephone calls to [the plaintiff]," which were "essential facts in [the plaintiff's] tort claims"); *Murphy v. Erwin-Wasey, Inc.*, 460 F.2d 661, 664 (1st Cir. 1972) ("Where a defendant knowingly sends into a state a false statement, intending that it should there be relied upon to the injury of a resident of that state, he has, for jurisdictional purposes, acted within that state."). *But see Rockwood Select Asset Fund XI(6)–1, LLC v. Devine, Millimet & Branch*, 750 F.3d 1178, 1180 (10th Cir. 2014) (concluding that making a phone call to Utah and sending an opinion letter to Utah did not establish minimum contacts). Of particular significance for plaintiffs who file suit in federal courts in Texas, the Fifth Circuit has concluded that "[w]hen the actual content of communications with a forum gives rise to intentional tort causes of action, this alone constitutes purposeful availment." *Wien Air Alaska, Inc. v. Brandt*,

195 F.3d 208, 213 (5th Cir. 1999); *see also Matassarrin v. Grosvenor*, No. 14-50148, 2014 U.S. App. LEXIS 21330, at *18 (5th Cir. Nov. 7, 2014) (unpublished) (concluding that sending allegedly fraudulent communications via email or fax to Texas regarding the purchase of a New Mexico condominium established minimum contacts). Even "[a] single act by a defendant can be enough to confer personal jurisdiction if that act gives rise to the claim being asserted." *Lewis v. Fresne*, 252 F.3d 352, 358-59 (5th Cir. 2001).

Furthermore, federal courts have repeatedly emphasized that personal jurisdiction does not hinge on whether the defendant has physically entered the forum. *See Neal*, 270 F.3d at 333 ("Physical presence is not the touchstone of personal jurisdiction."); *Oriental Trading Co.*, 236 F.3d at 943 ("The lack of physical presence in a state cannot alone defeat jurisdiction."). Nor does specific jurisdiction depend on whether a defendant sent a physical item, such as mail, rather than sending electronic communications into the forum or otherwise accessing the forum remotely. *See MacDermid, Inc. v. Deiter*, 702 F.3d 725, 726-27 (2d Cir. 2012) (determining a Connecticut court had specific jurisdiction "over a defendant who, while domiciled and working in Canada, is alleged to have accessed a computer server located in Connecticut to misappropriate confidential information belonging to her employer"); *Deutsche Bank Sec., Inc. v. Montana Bd. of Invs.*, 850 N.E.2d 1140, 1141, 1143 (N.Y. 2006) (concluding courts had jurisdiction over an out-of-state institutional trader that negotiated a multi-million-dollar transaction with an employee of a securities trading company in New York over an instant messaging system).[31] Accordingly, the Second Circuit

---

[31] *Cf. Wendt v. Horowitz*, 822 So.2d 1252, 1260 (Fla. 2002) (recognizing a tort can occur within Florida under the state's long-arm statute "through the nonresident defendant's telephonic, electronic, or written communications into Florida"); *Parke-Bernet Galleries, Inc. v. Franklyn*, 256 N.E.2d 506, 508-09 (N.Y. 1970) (concluding New York courts had jurisdiction over a nonresident defendant who actively bid on items at a New York auction using a telephone line).

recognized that a defendant purposefully availed herself of the privilege of conducting activities within a state when she intentionally accessed, retrieved, and disseminated confidential files stored in that state—even though those files were stored on a server located in the state rather than in a file cabinet. *See MacDermid*, 702 F.3d at 730.

Collectively, these cases recognize the realities of contemporary communications and business transactions: a defendant can engage in communications in a forum and conduct activities in a forum without ever physically entering the forum. A proper jurisdictional inquiry will not disregard a defendant's purposeful contacts with a forum simply because the defendant utilizes electronic or other means to establish its contacts. The Court affords no weight to Parex Canada's presence in Texas through technological instrumentalities and instead focuses on the fact that neither Parex Canada nor the subject matter of the transaction being negotiated were physically present in Texas; the Court's analytical approach and disposition is discordant with the weight of authority from other jurisdictions and incompatible with established United States Supreme Court precedent. I would hold Parex Canada's intentional contacts with Texas, albeit accomplished via technological means, constitute sufficient minimum contacts and are substantially connected to the operative facts of ERG's tortious-interference claim to enable Texas courts to exercise specific jurisdiction over Parex Canada in accordance with due process.

**B. Specific Jurisdiction Is Lacking Over Parex Bermuda**

I do not reach the same conclusion regarding Parex Bermuda, however. ERG claims Texas courts have specific jurisdiction over Parex Bermuda because Parex Bermuda expressly ratified Parex Canada's jurisdictional contacts at a Parex Bermuda board meeting approving the Ramshorn

acquisition. Based on deposition testimony, the board minutes reflect:

> After due consideration, having regards to the interests of Parex Resources, Inc., the ultimate parent of the company, it was resolved that the acquisition was in the best interests of the company and that the actions taken by Mr. Pinsky and Mr. Foo in connection with the negotiation of the terms of the acquisition and by Mr. Betts in executing the purchase agreement and the related transaction documents on behalf of the company be approved, ratified and confirmed in all respects.

Additionally, ERG claims Parex Bermuda implicitly ratified Parex Canada's jurisdictional contacts by accepting benefits under the SPA—i.e., purchasing the Ramshorn shares from Nabors. These contacts are immaterial if Parex Canada did not establish minimum contacts with Texas, and as a result, the Court did not consider the ratification issue.

Because I conclude Parex Canada's jurisdictional contacts were, in fact, sufficient, I consider the ratification arguments but ultimately agree with the Court that personal jurisdiction over Parex Bermuda is lacking.

### 1. Ratification of Jurisdictional Contacts

A principal can "subject himself to the jurisdiction of a foreign forum" by ratifying the acts of an agent. *Walker Ins. Servs. v. Bottle Rock Power Corp.*, 108 S.W.3d 538, 552 (Tex. App.—Houston [14th Dist.] 2003, no pet.). "Whether or not an agent is initially authorized to act on behalf of a principal, the agent's actions may be attributed to the principal, for purposes of personal jurisdiction, if the principal later ratifies the agent's conduct." *Id.* "The critical factor in determining whether a principal has ratified an unauthorized act by his agent is the principal's knowledge of the transaction and his actions in light of such knowledge." *Land Title Co. of Dallas, Inc. v. F.M. Stigler, Inc.*, 609 S.W.2d 754, 756 (Tex. 1980). Along "with full knowledge of the facts of the earlier act," ratification requires "approval by act, word, or conduct . . . with the intention of

giving validity to the earlier act." *White v. Harrison*, 390 S.W.3d 666, 672 (Tex. App.—Dallas 2012, no pet.).

Contrary to Parex Bermuda's arguments, however, an agency relationship "is not necessary to cause the ratification to be effective." *Disney Enters., Inc. v. Esprit Fin., Inc.*, 981 S.W.2d 25, 31 (Tex. App.—San Antonio 1998, pet. dism'd w.o.j.). Pre-incorporation activities also may be ratified by the later-incorporated entity and considered in assessing jurisdictional contacts. *See Rees v. Mosaic Techs., Inc.*, 742 F.2d 765, 768-69 (3d Cir. 1984) ("[T]he pre-incorporation activities of a promoter may form the basis for corporate liability when they have been ratified by post-incorporation acts of the corporation."). When a non-agent's act is subsequently ratified, however, an agency relationship is not created; consequently, not all the non-agent's actions are imputed to the principal. *See Esprit*, 981 S.W.2d at 31. Instead, ratification "will only bind the ratifier to the *specific* transaction that is ratified." *Id.* (emphasis added); *see also Bottle Rock*, 108 S.W.3d at 552 n.9 ("[A]lthough ratification of the act of a stranger will not create an agency relationship, it does bind the ratifier to the specific transaction that is ratified."). The ratifier is bound to the "entire transaction," however, and "may not, in equity, ratify those parts of the transaction which are beneficial and disavow those which are detrimental." *Land Title Co.*, 609 S.W.2d at 757. By accepting the benefits of a contract, the ratifier also becomes liable for the contractual obligations.

**2. Parex Bermuda Did Not Ratify Parex Canada's Jurisdictional Contacts**

To the extent supported by the evidence, we imply all findings necessary to support the trial court's conclusion that specific jurisdiction over Parex Bermuda is lacking. *See BMC Software*, 83 S.W.3d at 795. In arguing Parex Bermuda ratified Parex Canada's allegedly tortious

29

communications in Texas, ERG points to Parex Bermuda's (1) purchase of the Ramshorn shares as acceptance of benefits under the April 12 SPA and (2) express approval of certain actions at an April 17, 2012 meeting. At the meeting, Parex Bermuda's board approved the purchase of Ramshorn shares for $72,635,742, the actions Parex Canada's chief financial officer and chief executive officer took in negotiating the "terms of the acquisition," and the actions of Parex Bermuda's director "in executing the purchase agreement and the related transaction documents." Even if mere approval of a transaction was sufficient to constitute ratification,[32] ERG's cited evidence would only demonstrate that Parex Bermuda had ratified the specific purchase transaction, not that Parex Bermuda had ratified Parex Canada's earlier, allegedly tortious activities in Texas. *See Esprit*, 981 S.W.2d at 31; *Bottle Rock*, 108 S.W.3d at 552 n.9.

ERG cites no evidence that Parex Bermuda ratified either Parex Canada's earlier communications disclosing the plan for Parex Colombia to buy the Ramshorn shares or the LOIs Parex Canada sent to Nabors in March 2012, which form the basis of the tortious-interference claim. *See Elec. Bankcard Sys., Inc. v. Retriever Indus., Inc.*, No. 01-01-00240-CV, 2003 WL 204717, at *7 (Tex. App.—Houston [1st Dist.] Jan. 30, 2003, no pet.) (mem. op.) ("The wrongful conduct, if any, occurred when appellants' sales representatives were persuaded to discontinue their relations with appellants."). Consequently, evidence supports the trial court's implied finding that Parex Bermuda did not ratify the alleged tortious actions of Parex Canada, and as a result, Parex Bermuda is not amenable to the jurisdiction of Texas courts.

---

[32] *See Land Title Co. of Dallas, Inc. v. F.M. Stigler, Inc.*, 609 S.W.2d 754, 756 (Tex. 1980) (describing the principal's knowledge as "the critical factor" in assessing ratification); *White v. Harrison*, 390 S.W.3d 666, 672 (Tex. App.—Dallas 2012, no pet.) (characterizing the elements of ratification as "(1) approval by act, word, or conduct; (2) with full knowledge of the facts of the earlier act; and (3) with the intention of giving validity to the earlier act").

### III. Conclusion

By adopting a perfunctory analysis that ignores the realities of complex business negotiations in a 21st century economy, the Court unduly restricts the jurisdictional reach of Texas courts and renders Texas an anachronistic jurisdictional outlier. Moreover, the Court disregards our precedent by focusing on the presumed subjective intent behind Parex Canada's conduct in Texas, rather than focusing on Parex Canada's intentional conduct in Texas—intentional conduct that gives rise to ERG's cause of action. The jurisprudence is clear: when an out-of-state defendant engages in intentional conduct in a forum state, specific jurisdiction exists over causes of action arising from the forum conduct. A tortfeasor cannot evade the jurisdiction of Texas courts by committing a tort in Texas through technological means. Accordingly, I would reverse the court of appeals' judgment in part and hold Texas courts have specific jurisdiction over Parex Canada. I agree with the Court, however, that Parex Bermuda's special appearance was properly granted and Ramshorn's special appearance was properly denied.

_____
Eva M. Guzman
Justice

**Opinion delivered:** June 17, 2016

31